**FARISH v. COMMISSIONER OF INTER-
NAL REVENUE (two cases).**

**Nos. 8844, 8845.**

Circuit Court of Appeals, Fifth Circuit.
April 4, 1939.

Walter E. Barton, of Washington, D. C., for petitioners.

F. E. Youngman, O. W. Hammonds, and Sewall Key, Sp. Assts. to Atty. Gen., Jas. W. Morris, Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and DeWitt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before FOSTER, SIBLEY, and Mc-CORD, Circuit Judges.

FOSTER, Circuit Judge.

Petitioners are husband and wife, residents of Texas, and made separate tax returns of the community income for the years 1932 and 1933, taking deductions for losses incurred as members of two partnerships, to-wit, Huisache Stables and Farish, Wiess and Evans. Petitioners invoked the provisions of Sec. 23 of the Revenue Act of 1932, 26 U.S.C.A. § 23, which provide for deductions from gross income by an individual for losses "incurred in trade or business; or * * * incurred in any transaction entered into for profit, though not connected with the trade or business; * * *." The Commissioner disallowed the deductions on the theory the ventures were purely for pleasure. The Board approved his rulings. 36 B.T.A. 1114.

The Board found the facts substantially as follows: Huisache Stables is a partnership composed of W. S. Farish and S. P. Farish, brothers, each having one-half interest. Both brothers are primarily engaged in the oil business and occupy various executive positions. In 1933 their incomes from salaries and dividends were respectively about $200,000 and $100,000. The partnership was formed in 1928 for the purpose of breeding, training and selling polo ponies. In 1929 it assembled a drove of horses consisting of 2 thoroughbred stallions and 62 brood mares. These were located on a ranch near Uvalde, Texas. Because of drouth they were moved to anoth-

er location. Later, in 1934, the partnership purchased a ranch, consisting of 7,000 acres, near Berclair, Texas, and the horses were shipped to that ranch, which was also stocked with Hereford cattle. In 1933 the partnership owned a total of 175 horses. The partnership's expense of operation for the five years, 1929 to 1933, averaged about $9,120 yearly. There was no income for any of those years. In 1932 the net loss was $8,736.41; in 1933 it was $7,832.62. The book values of the partnership assets in 1932 and 1933 were about $16,000. S. P. Farish plays polo. His brother, W. S. Farish does not. W. S. Farish did not take an active part in the management of the partnership but relied principally on his brother to look after the business. The breeding, development and training of polo ponies require about 8 years before they are salable. It was expected that about 60 per cent of the horses would ultimately develop into polo ponies. At the time of the hearing, April 20, 1937, arrangements had been made to ship about 20 ponies to Long Island, in charge of a dealer, for sale. Polo ponies usually sell for from $250 to $1,000, an average of $750, but outstanding ponies at times bring very much higher prices.

The partnership of Farish, Wiess and Evans was organized under the following circumstances: In the spring of 1928 W. S. Farish, Wiess and Evans were in Kentucky and there met James Headley, a horse trainer. Farish, Wiess and Evans purchased 2 two-year old horses, which they put in training at Lexington, Kentucky, with a view of racing them. Later they were taken to Henderson, Kentucky, and one of them, a filly called Sylphonia, won a prize of $500 or $600. She cost $2,500 and after the race they were offered $7,500 for her. Thereafter Farish, Wiess and Evans purchased a one-half interest in Headley's stable, consisting of 20 odd horses and stable equipment, worth approximately $40,000. The partnership was continued for a couple of years under the name of Paradise Stock Farms. Headley became involved financially. A division was made of the stock in 1931 and the partnership of Farish, Wiess and Evans continued without Headley. In 1932 the partnership sustained a net loss of $20,742.93; in 1933 the net loss was $4,061.06. During these years the partnership was being liquidated. Petitioners had a 45% interest in the partnership. Wiess had a 45% interest and Evans' interest was 10%.

Based on these findings, and other facts not reflected therein but recited in the opinion, the Board concluded that, while repeated losses do not necessarily indicate an enterprise is not in fact a business, where the venture results only in losses from year to year, without any reasonable hope of profit, the rule is otherwise; that the record suggests W. S. Farish is a man of sound business judgment; that as to Huisache Stables the probability of realizing a fair profit was so remote as to negative the notion that he entered into the venture with any such expectation; that the partners had conceived the idea of breeding a new and perhaps outstanding strain of polo ponies; and that the accomplishment of such result might well have been considered by them as sufficient compensation, even if the venture otherwise produced no monetary gain.

█ In a case presenting only a question of fact we are bound by the findings of evidentiary facts by the Board, if supported by substantial evidence. But where the case presents a mixed question of fact and law, the conclusions of the Board are not controlling and we are at liberty to substitute our judgment for that of the Board. In this case the evidence was uncontradicted and unimpeached and the conclusions of the Board involve a construction of the statute. Therefore, the case presents a mixed question of law and fact. Helvering, Commissioner v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755; Washburn v. Commissioner, 8 Cir., 51 F.2d 949; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, certiorari denied 293 U.S. 583, 55 S.Ct. 97, 79 L.Ed. 679.

So far as the findings of the Board go they are supported by competent evidence but they omit relevant facts shown by the evidence in the record. As to both enterprises the partners testified they expected to ultimately make a profit out of them and gave comprehensive reasons for that belief. The Board disregarded this testimony. It is also shown that at the time of the hearing, April, 1937, Huisache Stables had 6 horses about ready for sale; 2 that ought to bring $3,000 apiece, 1 that ought to bring $2,000 and 3 others that ought to bring $1,000 apiece; and that 9 other horses not quite ready for sale would compare favorably to those first mentioned. It was also shown that a polo pony, if considered favorably by a player who has sufficient money to invest, may bring $10,000 to $20,000.

The intention of the taxpayer at the outset is the dominant factor in determining whether he engaged in the venture merely for pleasure or for profit. Of course, the Board could rest its decision on the circumstantial evidence, as opposed to the sworn testimony of the taxpayer. But we think the Board was psychologically wrong in concluding that the Farishes, as men of sound business judgment, would not have engaged in the ventures with any expectation of profit. Both are actively engaged in the oil business. It is common for a man in the oil business, of sound judgment, to expend thousands of dollars in exploring the land and drilling for oil in "wild cat" territory. Sometimes this results in dry holes and the costs of drilling and development are totally lost. On other occasions, producing wells are brought in and the profits are enormous. The breeding of horses would not be considered merely a fad in Texas. It is not at all improbable that men in the oil business, having ample capital, would engage in the enterprises here involved with the hope and expectation of ultimately making a fair return on the investment.

It must be remembered that it was impossible for Huisache Stables to have made a profit from the sale of polo ponies by the end of 1938. The breeding of ponies started in 1929. The enterprise had been in operation only five years and the breeding, training and development of polo ponies takes eight years. In that respect it was not different to many other enterprises that are well recognized as businesses and are certainly entered into for profit. For instance, one who plants a fruit orchard must wait a number of years before the trees produce fruit in sufficient quantities to show profit but the expense of cultivation goes on every year before that.

There is also no basis for the conclusion the Farishes intended to produce a superior breed of polo ponies and would consider that sufficient compensation. It is shown English and Argentine polo ponies are considered superior to American stock and bring the highest prices. The record supports the conclusion that the Farishes hoped to produce sufficient average American polo ponies, including a few outstanding ponies, to make the venture profitable, after the first eight years of development. That they were continuing the business and had added cattle to their stock tends to support this conclusion.

With regard to the partnership of Farish, Wiess and Evans it is certain that it started off with a possibility of profit. One of the two horses it bought could have been sold at a profit of 200% on initial cost. The evidence also shows that Headley was a well known and successful breeder and trainer of horses, which is a well recognized business. It is reasonable to presume that but for Headley's financial difficulties this enterprise would probably have been profitable. As soon as he was out of the partnership the other partners began liquidating its affairs. This would tend to show that the transaction had been entered into for profit.

As to both partnerships we conclude that they were transactions entered into for profit and the losses incurred, which are stipulated, were deductible on the returns of petitioners for income taxes for the years involved. The evidence in the record is sufficient to overcome the prima facie presumption in favor of the Commissioner's determination.

The petitions are granted, the judgments are reversed and the causes are remanded to the Board for further proceedings in conformity to this opinion.