ALAN B. FIELDS, JR. AND JUDITH P. FIELDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fields v. Commissioner
Docket No. 11492-79.
United States Tax Court
T.C. Memo 1981-550; 1981 Tax Ct. Memo LEXIS 190; 42 T.C.M. (CCH) 1220; T.C.M. (RIA) 81550; September 28, 1981. *190 Petitioners commenced a cattle-raising operation in 1973. They expended substantial funds and great effort in deveoping their land, although they incurred an uninterrupted series of losses from the farm over a number of years. Held, for the taxable years 1975 through 1977 petitioners' cattle-breeding operation was an activity engaged in for profit and therefore is not within the reach of sec. 183, I.R.C. 1954. Effect of decision limited to years at issue. Alan B. Fields, Jr., pro se. J. Michael Melvin, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated May 14, 1979 respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1975
$ 6,955
1976
3,492
1977
3,152
After concessions, the sole issue for our decision is whether petitioners' cattle-raising operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a), I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto, together with the amendment to stipulation of facts, are incorporated herein by this reference. *191 Petitioners Alan B. Fields, Jr. and his wife Judith P. Fields resided in San Mateo, Florida at the time of filing the petition herein. They filed joint Federal income tax returns for the calendar years 1975, 1976 and 1977 with the Office of the Director, Internal Revenue Service Center, Chamblee, Georgia. Petitioner Alan B. Fields, Jr. was a practicing attorney in Pensacola Florida until 1969, at which time he moved to Palatka, Florida. During the tax years in question, Mr. Fields had a full-time law practice which included working on a part-time basis for the Board of County Commissioners of Putnam County, Florida. In addition, Mr. Fields held interests in several small business corporations and partnerships. Petitioners' taxable income during the years 1971 through 1979 was as follows: Year
Taxable Income
1971
$ 12,330
1972
23,130
1973
22,846
1974
46,543
1975
81,626
1976
37,336
1977
58,983
1978
38,808
1979
53,076
In 1971 petitioners bought a house and approximately 21 acres of land in San Mateo, Florida. They subsequently acquired additional acreage of 49 1/2 acres in 1973 and 3 acres in 1975. Thus, for the years before the Court, petitioners owned land aggregating approximately 74 acres. The *192 cost to petitioners of acquiring the land was as follows: 1971 parcel (21 acres)
$ 33,500
1973 parcel (49.5 acres)
24,750
1975 parcel (3 acres)
3,000
TOTAL
$ 61,250
Of the 74 acres, approximately 2 1/2 acres were set aside as petitioners' homesite. Petitioners' land also contained several outbuildings, including an old barn, a concrete block building, a wash shed and a dilapidated garage. Although the previous landowners had raised cattle on the land, petitioners' property at purchase was in poor condition for such use. Much of the soil was sandy and covered with debris. The soil lacked many of the nutrients necessary for the growing of grass suitable for grazing. There was also a bog on a portion of the land. Shortly after their purchase, petitioners began to make improvements to their land in hopes of developing it for use as a pasture. To further their goal, they added three ponds to their property and enlarged another.At least one of these ponds was constructed to drain the bog and thereby facilitate the planting and growing of grass.Petitioners hired a contractor to do much of the land clearing, to dig the ponds and to build some of the fences on the land. [1] Additionally, petitioners *193 solicited and received advice from the United States Department of Agriculture and the Florida Agricultural Extension Service concerning certain soil development and conservation measures for a cattle pasture. One of the recommended conservation measures employed by the petitioners was the improvement and protection of a permanent vegatation cover through seeding, fertilizing and liming as shown to be needed by a soil test. For following such advice, petitioners received subsidies pursuant to the cost sharing practices of the Department of Agriculture. Such payments comprised the bulk of petitioners' income from their farm operations from the years 1971 through 1979. [2]
Petitioner Alan B. Fields, Jr.'s interest in cattle raising dates from at least 1949 when he unsuccessfully attempted to join the family operation in Texas. His family has been involved in agricultural *194 pursuits for generations, dating back to the years before the Civil War. In 1973, petitioners commenced a cow-calf operation [3] with the purchase of 3 Braford Cows, all pregnant with calf. On September 21, 1973, petitioners applied for and received a cattle brand registration from the State of Florida. Petitioners opened a separate checking account for the farm operation and kept separate ledgers therefor. After the commencement of the operation, Mr. Fields devoted a substantial amount of time to the farm.On weekdays, he rose early in the morning to work on the farm before leaving for his law firm. He spent virtually all of his weekends working on the farm. Mr. Fields never employed trained farmhands to assist him, although his wife and their four children did contribute frequent services. Because *195 of the constant responsibilities of the farm, petitioners took no vacations from 1975 through 1977. Beginning in 1973, when the cow-calf operation was commenced, petitioners expanded their herd from the initial size of 3 cows to the ultimate size of 17 cattle. Such expansion was solely by means of the "natural increase method," for petitioners did not purchase any cattle during the years of operation of their farm despite the fact that breed cows were available at bargain prices in the mid-1970's. All increases were due to the breeding of petitioners' cattle with a bull on loan from another farmer. Over the years since 1973, the increase in petitioners' herd was counteracted in several ways. Two of petitioners' steers were slaughtered for personal consumption, one calf was sold in 1975 for $ 241 and another was traded for feed. Additionally, one cow died during pregnancy with the resultant loss of both the mother and its calf. The record does not reveal the breakdown of petitioners' herd into steers, cows, heifers and bulls. [4]
Mr. Fields projected, in 1973, *196 that his pasture eventually would support some 60 cattle. At that time, he intended to expand his herd both by the natural increase method and by purchase.However, from the years 1974 though 1977 petitioners' farm was subject to an extreme drought condition that diminished the quality of the pasture for grazing purposes. Petitioners did not compensate for this effect by purchasing food supplements for their cattle. Petitioners also were engaged in dog breeding for a brief time, realizing total income of $ 855 therefrom, but abandoned such activity when their two breed dogs died. At one time, petitioners planned to grow watermelons on their land, but dropped such plans before the project ever got started. In connection with petitioners' farm activities during the period from 1971 to 1979, assets with the following values were depreciated by petitioners: 1971
1972
1973
1974
1975
Building
$ 1,000
$ 4,100
$ 4,100
$ 4,100
Machinery
2,369
2,369
3,122
3,122
Horse
125
125
Dogs
50
50
50
50
Truck
4,586
4,586
House
Trailer
425
425
Well
877
877
Fencing
2,358
6,779
Cows
800
1,500
TOTAL
$ 3,544
$ 6,644
$ 16,318
$ 21,439
1976
1977
1978
1979
Building
$ 4,100
$ 4,100
$ 4,100
$ 4,100
Machinery
3,122
4,642
4,642
Horse
Dogs
90
90
90
90
Truck
4,586
4,586
4,586
House
Trailer
Well
877
877
1,937
1,937
Fencing
6,779
6,779
6,779
7,729
Cows
TOTAL
$ 19,554
$ 16,432
$ 22,134
$ 18,498
*197 The total income for that period from petitioners' use of their land was as follows: 1971
$ 134
(Agriculture payment)
1972
100
(Agriculture payment)
1973
1974
405
(Sale of dogs)
1,325
(Agriculture payment)
1975
241
(Sale of calves)
250
(Sale of dogs)
1976
381
(Patronage dividends)
219
(Agriculture payment)
1977
200
(Sale of dogs)
2,443
(Agriculture payment)
1978
145
(Patronage dividends)
267
(Agriculture payment)
1979
131
(Patronage dividends)
TOTAL
$ 6,241
During these same years, petitioners had expenses as follows: 1971
1972
1973
1974
1975
Cash
$ 1,642
$ 2,134
$ 4,150
$ 6,124
$ 13,137
Depre-
ciation -
612
1,039
2,617
3,268
1976
1977
1978
1979
Cash
$ 9,231
$ 6,097
$ 5,995
$ 2,640
Depre-
ciation -
3,257
2,915
1,804
1,953
TOTAL CASH EXPENDITURES
$ 51,150
TOTAL DEPRECIATION EXPENSES
17,465
GRAND TOTAL
$ 68,615
Thus, since the time of the purchase of their property in San Mateo, Florida, petitioners have claimed net farm losses for every taxable year including the years before the Court. Petitioners deducted $ 16,405, $ 12,488 and $ 9,012 as farm expenses on Schedule F of their Federal income tax returns for the taxable years 1975, 1976 and 1977, respectively. Petitioners reported Schedule F income of $ 491, $ 600 and $ 3,024 for these years. In his statutory *198 notice, respondent disallowed all Schedule F expenses in excess of Schedule F income for the taxable years 1975 through 1977, and determined that petitioners owed tax deficiencies of $ 6,955 for 1975, $ 3,492 for 1976, and $ 3,152 for 1977. The deductions were disallowed on the ground that petitioners' activities were not engaged in for profit and therefore were subject to the limitations of section 183(a). Subsequently, respondent allowed expense deductions of $ 4,685 for 1975 and $ 4,478 for 1976. These amounts represented the Schedule F interest expenses which had been disallowed in respondent's statutory notice and to which the petitioners concededly are entitled under section 183(b)(1). OPINION The sole issue for our decision is whether petitioners' farm expenses for the taxable years 1975 through 1977 were expenses incurred in an activity not engaged in for profit within the meaning of section 183(a). Our inquiry is a factual one. Section 183(a) limits deductions for expenses attributable to an activity not engaged in for profit. [5] Such an activity is defined in section 183(c). [6] Under section 183(b)(1) taxpayers involved in such an activity may deduct expenses incurred *199 therefrom only to the extent the gross income derived from the activity exceeds deductions allowable without regard to whether the activity is engaged in for profit. [7] *200 Thus, if it is found that a taxpayer's activity was not carried on with the requisite profit motive, deductions are not allowable except within the limits of section 183(b). The test for determining whether an activity is engaged in for profit is whether the individual is engaged in the activity with the predominant purpose and intention of making a profit therefrom. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979). The taxpayer's expectation of profit need not be a reasonable one, but it must be in good faith. Sec. 1.183-2(a), Income Tax Regs.; Allen v. Commissioner, 72 T.C. 28, 33 (1979). The determination of whether the requisite intention exists is a determination of fact to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), *201 affd. 615 F.2d 578 (2d Cir. 1980). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is to be controlling, for all facts are to be weighed together in the divining of petitioners' true intention. Dunn v. Commissioner, supra at 720. As is usual, the burden of proof is on the petitioners, Rule 142(a), Tax Court Rules of Practice and Procedure; Golanty v. Commissioner, supra at 426, with greater weight to be placed upon objective facts than upon *202 petitioners' mere statement of their intent. Sec. 1.183-2(a), Income Tax Regs. ; Churchman v. Commissioner, 68 T.C. 696, 701 (1977). Respondent contends that petitioners' management of their cattle-raising operation was completely inconsistent with the profit motive. According to respondent, the most that can be said with respect to petitioners' cattle-raising activities during the taxable years in question is that petitioners were endeavoring to improve their pasture and build up their herd to enable them to engage in a business which might prove profitable at some future point in time, and therefore that petitioners had not yet entered into the profit-making venture. Petitioners assert that they entered and have continued their farm operation with the intention of reaping profit therefrom. Petitioners also assert that much of their development of the farmland was undertaken with an eye to the future resale of their property for profit. Respondent draws our attention to several factors that arguably belie the existence of a profit motive. Respondent believes that the uninterrupted Schedule F losses of petitioners are particularly telling in this respect, especially in light of *203 the disproportionate ratio between income and expenses.Respondent points to the slow growth of petitioners' herd and to petitioners' negligible sales activity during the years of operation as being indicative of a lack of profit motive. Additionally, respondent argues that petitioners' alleged failure to keep production records or make budgets shows that petitioners did not perceive themselves to be engaged in a business activity. Respondent attempts to refute petitioners' stated intention to derive a profit from the future resale of their farm by challenging petitioners' appraisal of their land. In addition, respondent argues that, even if petitioners' stated intention to resell the developed land for profit is accepted as true, the farm operation and the holding of the land for resale should be considered two separate activities for purposes of section 183(a) such that the profit motive with respect to the holding of land should not carry over to the farming activity. Respondent asserts that the lack of profit motive is further supported by the fact that petitioner Allen B. Fields, Jr. was a full-time attorney during the tax years before the Court, deriving a comfortable living *204 therefrom. Finally, respondent argues that petitioners had not yet entered the cattle business when the controverted deductions were taken, but were only in a developmental stage from which petitioners had no hope of reaping any profit. With respect to respondent's contention that petitioners' loss history undermines the existence of a profit motive, we note at the outset that section 183 cases do not arise when an activity is operating at a profit. A period of uninterrupted losses is generally the triggering condition to a section 183 controversy, but by no means assures the outcome. This is not to say that a taxpayer's loss history is unimportant in a section 183 case; it is certainly very relevant. However, "if losses, or even repeated losses, were the only criterion by which farming is to be judged, then a large proportion of the farmers of the country would be outside the pale." Riker v. Commissioner, 6 B.T.A. 890, 893 (1927). Continued losses will usually weaken a taxpayer's position, however, if they occur over an extended period of time and cannot be adequately explained by the taxpayer. Allen v. Commissioner, supra at 34. Here, petitioners' losses were of a short duration *205 and were understandable considering the circumstances. Petitioners began their cow-calf operation in 1973. The years before the Court are the taxable years 1975, 1976 and 1977, the third, fourth and fifth years of operation. In Engdahl v. Commissioner, 72 T.C. 659, 663 (1979), taxpayers were allowed a deduction despite 10 straight years of losses in their horse-breeding operation. Likewise, in Allen v. Commissioner, supra at 30, deductions were allowed in the face of 8 straight years of losses. See also Babbitt v. Commissioner, 23 T.C. 850, 866 (1955); Smith v. Commissioner, 9 T.C. 1150, 1151 (1947); and Farish v. Commissioner, 103 F.2d 63, 65 (5th Cir. 1939), revg. 36 B.T.A. 1114 (1937). Thus, the period of time over which petitioners' losses arose was not unduly long compared to the number of loss years that we have tolerated in other cases and normally would not be of sufficient duration to obliterate an initial profit expectation. [8]
In the context of this case, petitioners' losses are explainable. It is not uncommon *206 for a business to incur steady losses during its formative years. Thus, a series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Start-up losses are especially common in breeding operations. See Engdahl v. Commissioner, supra at 669; Bessenyer v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); Farish v. Commissioner, supra at 65. Moreover, initial losses are almost a certainty where repairs to and development of farmland are necessary to the growth and viability of the operation. [9]
There is further explanation for the losses incurred by the petitioners during the years in question. During this time, petitioners' pastureland was burdened by a drought which impeded the planned expansion of petitioners' herd, thereby reducing the availability of cattle for sale. *207 [10] This situation was compounded by the poor market conditions existing in the cattle business during this period. [11] Thus, petitioners' losses are unsurprising, especially when considered in light of testimony of respondent's expert witness (a local cattle farmer) that he knew of no other farmers, including himself, in petitioners' county who made a profit in the years 1975 and 1976. Respondent also is perturbed by the disproportionality between petitioners' income and expenses. However, petitioners were in the start-up stage of a business that began to suffer from unfavorable climatic and economic conditions. Under these circumstances, losses are not inconsistent with a profit motive. Respondent points to the slow growth of petitioners' herd and to petitioners' negligible sales activity during the years of operation as being indicative of a lack of profit motive.The slow growth of petitioners' *208 herd was a consequence of the management decision made by petitioners to feed their cattle solely by means of grazing and not by food supplements.As a result of the drought, the capacity of petitioners' pasture was reduced. Since petitioners chose not to supplement this food loss by purchase, their only choice was to delay the expansion of their herd. [12] This was so despite the fact that cattle could be purchased cheaply at the time. Such price conditions help explain the absence of substantial sales activity by petitioners during the years in question. Thus, the combination of a drought condition and a poor market condition resulted in a situation wherein it conceivably could have been a reasonable business decision to neither sell nor purchase cattle.
A further factor to be considered in determining the existence or nonexistence of a profit motive is whether the taxpayer has maintained complete and accurate books and records for the alleged business. Section 1.183-2(b)(1), Income Tax Regs. Here, petitioners maintained a separate checking account and separate ledgers for their farm operation. Mr. Fields testified that *209 he had kept cattle production records but that these records had been lost shortly before trial. While the maintenance of such records is no doubt helpful and was recommended by respondent's expert, we do not believe that they are an absolute requirement to the success of an operation the size of petitioners'. Thus, assuming that petitioners' alleged production records were inadequate or even nonexistent, we find that petitioners' ledgers amounted to sufficient recordkeeping for their purposes. See Engdahl v. Commissioner, supra at 667. [13]
Petitioners stated that they also hoped to reap an eventual profit from the resale of their farmland. This is a relevant factor in the determination of the existence of a profit motive. According to section 1.183-2(b)(4), Income Tax Regs.--
The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity *210 is realized since income from the activity together with the appreciation of land will exceed expenses of operation. Respondent attempts to defeat this argument by assailing petitioners' valuation of their land. Despite the absence of expert appraisal, respondent in his brief deflates petitioners' valuation to the extent that the combined costs of the land and farm operation conveniently exceed respondents' substituted valuation. However, it is not the existence of actual profit, whether realized or inherent, that we are concerned with, for as we stated above these cases do not arise in a profit context. It is the expectation of gain, and not the gain itself, which makes or breaks the taxpayer in a section 183 case. Thus, even if we assume that respondent's calculations are correct, petitioners may have entertained and may continue to entertain a bona fide belief that they will turn an eventual profit. [14] *211 Even if it is accepted that petitioners possess a profit motive with respect to the appreciation of their farmland, respondent contends that the holding of the land and the farming activities constituted two separate activities such that any profit intention with respect to the holding of land would not carry over to the farming operation. In light of respondent's argument as a whole, we find this contention to be at least inconsistent if not disingenuous. Many of the expenses reported by petitioners on the Schedules F attached to their returns were incurred in the development and improvement of their farmland. Respondent *212 goes so far in his brief as to say that the petitioners had made virtually no expenditures directly related to cattle. Nevertheless, respondent utilized all such expenditures in his comparison of income and expenses arising out of the cattle operation. Thus, respondent has combined the holding of the land and the cattle business into a single activity when such combination is advantageous to his position and now seeks to separate the two activities for the same reason. Section 1.183-1(d)(1), Income Tax Regs., provides that-- Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Here, the farming operation did not reduce the net cost of carrying the land. Therefore, if the land was purchased or held primarily for the purpose of deriving a profit from appreciation, the two activities should be considered separate. However, we find that the primary purpose of retention of the land was to conduct the *213 farming activities and that the holding of the land for appreciation was collateral to that purpose. See Engdahl v. Commissioner, supra at 668. [15] Thus, although petitioners expected the property to appreciate in value, the property was not purchased primarily for appreciation purposes. Respondent asserts that petitioners purchased the farm primarily to satisfy their desire to live on a country estate and to fulfill Mr. Fields' lifelong ambition to "dabble" in cattle raising. Petitioners' farm was not a "country estate" in the conventional sense of the word. There were no recreational or entertainment facilities such as a swimming pool or a guest house. Petitioners' personal residence appeared to be a modest home. Even if we conclude that petitioners derived tremendous pleasure from residing in their country home, this fact alone should not negate an intent to operate the farm for profit, Smith v. Commissioner, 9 T.C. 1150, 1155 (1947). The argument that a taxpayer's activities constituted a hobby rather than a business simply because such taxpayer enjoyed the activities has met with little success in the past. In Jackson v. Commissioner, 59 T.C. 312, 317 (1972), *214 we declared that "suffering has never been made a prerequisite to deductibility." A farm is no less a business simply because its operation gives the owner pleasure. See Wilson v. Eisner, 282 F. 38, 42 (2d Cir. 1922). As a final argument, respondent urges that even if petitioners had the intention to reap an ultimate profit from their activities, petitioners were not yet engaged in the profit-making activity for the tax years in question but were merely preparing to enter such activity. Respondent cites Wallendal v. Commissioner, 31 T.C. 1249, 1251 (1959), as support for this position. Wallendal is easily distinguishable on its facts, for that case involved a deduction for interest paid by a taxpayer on the unpaid balance of the acquisition price of a share in a laundry partnership prior to any actual business activities. We are convinced that petitioners in our case were in fact engaged in the cattle raising business during the taxable years 1975 through 1977. Petitioners were building their herd and improving their land during this start-up period. The fact that losses were incurred during the first few years does not mean that petitioners had not yet entered into the cattle-raising *215 business. Start-up losses after the entry into a new business are clearly contemplated by the regulations. Sec. 1-183-2(b)(6), Income Tax Regs. See Engdahl v. Commissioner, supra at 669. See also Farish v. Commissioner, 103 F.2d 63, 65 (5th Cir. 1939), revg. 36 B.T.A. 1114 (1937); Temple v. Commissioner, 10 B.T.A. 1238, 1239 (1928); Otis v. Commissioner, 7 B.T.A. 882, 883 (1927). [16]
In attempting to carry their burden of proof, petitioners presented evidence that demonstrates a profit motive. Mr. Fields devoted a substantial amount of time and effort to the farm. He supplemented the experience he had gained through prior exposure to the *216 cattle-raising business by soliciting expert advice with respect to the development of his land for grazing purposes. See sec. 1.183-2(b)(2), Income Tax Regs.; Engdahl v. Commissioner, supra at 668. Petitioners kept adequate books and records with respect to their operation. In addition, petitioners had a reasonable expectation that they would derive an overall profit upon the resale of the land. Finally, and importantly, we found petitioners to be credible and forthright in their testimony. It is clear to this Court that petitioners did not enter into the activities herein lightly. We find that they had a sincere intention to reap a profit both from their cattle-raising operation and from the appreciation of their property. It naturally follows that petitioners do not fall within the grasp of section 183. In so holding, we do not intend to give the petitioners a "blank check" for the future; at some point, if the losses continue unabated, petitioners could be deemed foolhardy to the extent of having abandoned any possible profit motive. Decision will be entered for the petitioners. Footnotes
1. Since acquiring the first parcel of property in 1971, petitioners have expended the following amounts for land clearance: ↩
1973
$ 2,406.00
1974
40,379.87
1975
19,801.69
1976
1977
10,000,00
Total
$ 72,587.56
2. Agriculture payments from 1971 to 1979 totaled $ 4,488 Petitioners' total income from the farm during this time was $ 6,241.↩
3. In a cow-calf operation, the farmer breeds cattle to produce offspring for sale.Such an operation is to be distinguished from a stock operation and a feedlot operation. In a stock operation, mature and semi-mature cattle are purchased for fattening and subsequent resale. No reproduction is involved. In a feedlot operation, calves and cows are put on a feedlot and marketed for slaughter.↩
4. Mr. Fields testified that he had kept detailed records of his cattle, but that these records had been lost prior to trial.↩
5. Sec. 183 provides in pertinent part as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. ↩
6. Sec. 183(c) provides as follows: (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. ↩
7. Sec. 183(b) provides in pertinent part as follows: (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). Sec. 183(b)(1)↩ also leaves intact all deductions that normally would be available without regard to whether the taxpayer's activities were not engaged in for profit.
8. Losses cannot go on forever, though. Repeated losses must surely dim and eventually extinguish the profit expectations of even the brightest of optimists.↩
9. See, in this respect, Wise v. Commissioner, T.C. Memo. 1957-83, affd. 260 F.2d 354 (6th Cir. 1958); Clay v. Commissioner, a Memorandum Opinion of this Court dated Aug. 5, 1941; Temple v. Commissioner, 10 B.T.A. 1238, 1239↩ (1928).
10. See Dickerson v. United States, an unreported case ( N.D. Tex. 1961, 7 AFTR 2d 698, 699, 61-1 USTC par. 9189); Lowenthal v. Commissioner, T.C. Memo. 1968-79↩. 11. See Barbour v. Commissioner, T.C. Memo. 1976-85↩, where poor market conditions were found in part to justify sustained losses.
12. See generally Ellsworth v. Commissioner, T.C. Memo. 1962-32↩.
13. See also Edge v. Commissioner, T.C. Memo. 1973-274↩.
14. See Allen v. Commissioner, 72 T.C. 28 (1979), wherein this Court stated: Although the petitioners have sustained substantial current losses, they still hope, in the long run, to realize a profit because the fair market value of the lodge has appreciated to approximately $ 45,000. The appreciation in value may, or may not in fact, offset the aggregate operating losses, but the prospect of realizing a profit on the sale of the lodge was bona fide when Mr. Allen decided to invest in the lodge and is sufficient to explain his willingness to continue to sustain operating losses. [72 T.C. at 36.] See also Sanderson v. Commissioner, T.C. Memo. 1964-284↩, wherein it was stated that "while profits and losses must be computed on an annual basis for tax purposes, this is not necessarily true in determining whether there was a bona fide profit motive."
15. See also Sparre v. Commissioner, T.C. Memo. 1980-45↩.
16. Respondent's argument would be more apt in a case such as Westervelt v. Commissioner, 8 T.C. 1248, 1254-1255↩ (1947). There, the taxpayer made several trips to collect data and information concerning thoroughbred cattle procedures and grasses for pasture lands. He deducted the traveling expenses as ordinary and necessary expenses of a trade or business. The Court found that the trips were preparatory to his entry into the cattle business, for at the time of the trips the taxpayer owned no cattle and was engaged in no regular farming activities.