T.C. Memo. 2014-148

UNITED STATES TAX COURT

RAYMOND E. GARDNER AND SHERRY N. GARDNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18976-09.                           Filed July 28, 2014.

<u>David E. Price</u> and <u>Adria S. Price</u>, for petitioners.

<u>Diana N. Wells</u> and <u>Joline M. Wang</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies of $10,448, $9,655,

and $236,600 in petitioners' Federal income tax for the taxable years 2002, 2003,

and 2004 (years at issue), respectively, and accuracy-related penalties of

[*2] $2,089.60, $1,931, and $47,320 under section 6662(a)[1] for the taxable years 2002, 2003, and 2004, respectively. The issues for decision are: (1) whether Raymond Gardner's (petitioner) cattle operation was an activity "not engaged in for profit" within the meaning of section 183 and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a).[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in North Carolina.

Petitioner has been in the insurance business since 1973. Petitioner operates RE Gardner & Associates, an insurance business selling insurance policies, mutual funds, and annuities. Petitioner has been successful with his insurance business

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The notice of deficiency also asserted adjustments to Schedule C, Profit or Loss From Business, for the 2003 tax year. These adjustments are not in dispute. Petitioners executed a Form 870, Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, agreeing to these adjustments and the tax associated with these adjustments has been assessed.

[*3] and reported income on Schedules C of $152,373, $163,305, and $579,236 for the taxable years 2002, 2003, and 2004, respectively.

In addition to his insurance business, petitioner was involved in many other commercial activities. Petitioner was a member of Woodbridge, LLC, which constructed homes in Wilmington, North Carolina. Petitioner reported on Schedules E, Supplemental Income and Loss, income of $6,063 for the taxable year 2002, a loss of $445 for the taxable year 2003, and income of $5,173 for the taxable year 2004. Petitioner was a member of Colwen Lodging, LLC, and was responsible for raising capital and bringing in additional members. Petitioner reported on Schedules E income of $5,800 and $2,124 for the taxable years 2002 and 2003, and a loss of $684 for the taxable year 2004. Petitioner was a 33% owner in WINC, LLC, a company that constructed homes in Wisconsin, North Carolina, and Indiana. Petitioner was responsible for overseeing all of the North Carolina properties. Petitioner reported on Schedules E losses of $42,315 and $64,955 for the taxable years 2002 and 2003 and income of $32,208 for the taxable year 2004. Petitioner was the president of State Insurance Services, Inc., which provided supplemental insurance for State agencies. Petitioner reported on Schedules E income of $336, $26,256, and $43,621 for the taxable years 2002, 2003, and 2004, respectively. Petitioner's ownership interest in these four entities

[*4] were the only interests he reported on Part II, Income or Loss From Partnerships and S Corporations, of Schedules E. Petitioner reported total losses of $30,116 and $37,020 for the taxable years 2002 and 2003 and total income of $80,318 for the taxable year 2004 from partnerships and S corporations on Schedules E.

Cattle Operation

Prior to 2001 petitioner did not own or lease any cattle. In 2001 petitioner initiated his cattle operation. Petitioner's one-page business plan for 2001 stated that he planned to "[p]roduce animals that are genetically superior". During the years at issue petitioner's cattle operation dealt almost exclusively with entities owned by John Pearl and David Pearl.

World Livestock, Inc. (World Livestock), is a C corporation incorporated in the State of Indiana. David Pearl owns 76% of the stock of World Livestock. On September 25, 2001, petitioner and David Pearl, on behalf of World Livestock, entered into a consultation retainer agreement whereby World Livestock promised to provide 150 hours of consulting services and services for $100,000 of sales, if

[*5] sales were made, at no charge to petitioner from September to December 2001.[3] World Livestock's fee for the agreement was $7,500.[4]

Wea Valley Farms, Inc. (Wea Valley Farms), is a C corporation incorporated in the State of Indiana. Wea Valley Farms is owned by David Pearl, John Pearl, Brenda Pearl, and Laura Theadman. On November 9, 2001, petitioner and David Pearl, on behalf of Wea Valley Farms, entered into a donor purchase/ownership agreement, whereby Wea Valley Farms transferred to petitioner a one-half interest in two embryo donors for $6,500 each. The agreement provides that the cows are jointly owned for the purpose of producing embryos for petitioner's cattle operation and Wea Valley Farms. The agreement provides that the purchase of the one-half interest in the donor cows was to provide enough embryos to accomplish petitioner's goals for his cattle herd.

Gene Bank of North America, Inc. (Gene Bank), is a C corporation incorporated in the State of Indiana. Gene Bank is owned by David Pearl. On November 28, 2001, petitioner and David Pearl, on behalf of Gene Bank, entered into Cattle Lease Agreement - 005, whereby Gene Bank leased to petitioner 81

---

[3]Petitioner provided no evidence that any sales were generated by World Livestock for petitioner from September to December 2001.

[4]Petitioner entered into one-year consultation retainer agreements with World Livestock in 2002, 2003, 2004, and 2005.

**[*6]** female cattle ready for breeding or embryo transfer for $25,920.[5] The term of the agreement was seven years.

Both petitioner and Gene Bank violated multiple provisions of the agreement. The agreement provided that petitioner would carry a normal farm operation public liability and property damage policy of insurance on the herd throughout the term of the agreement. Petitioner never carried such an insurance policy. The agreement also provided that petitioner could not pledge the cattle as collateral to secure any debt. Petitioner executed 20 promissory notes with other entities in which he pledged the cattle as collateral. The agreement further provided that petitioner would institute proper documents in breed associations that would enable Gene Bank to register calves produced from the cattle. Petitioner failed to register the cattle with a breed association. Gene Bank has not taken any legal action against petitioner for violating the agreement.

The agreement required that Gene Bank vaccinate the females retained in the herd for brucellosis, IBR, BVD, and leptospirosis. Gene Bank did not vaccinate the females retained in the herd for brucellosis. The agreement also provided that Gene Bank would keep the cattle in Illinois or Indiana. As of

---

[5]The agreement provided that petitioner would pay Gene Bank $15,000 in cash by December 3, 2001. Petitioner provided no documentation to support his assertion that he made the $15,000 payment.

[*7] August 18, 2002, 11 of the 36 initial cattle were located in Missouri, while the remaining were located in Indiana and Illinois. Petitioner never took legal action against Gene Bank for violating the agreement.

Petitioner was not involved with the daily care and maintenance of the cattle. Instead, petitioner contracted with the entities owned by John Pearl and David Pearl to provide for the daily care and maintenance of the cattle. Petitioner is not aware of the amount of time the caretakers spent caring for his cattle. Any bull calves resulting from petitioner's herd were given to the caretakers as payment for the feed and caretaking of the herd. Petitioner did not maintain records of the calves provided to the caretakers.

Promissory Notes

Petitioner's cattle operation allegedly incurred $991,842 of expenses for the taxable years 2001 through 2010. The only evidence of payment of these expenses petitioner offered was seven checks, totaling $74,618, written to entities controlled by John Pearl and David Pearl. Petitioner executed 24 promissory notes with entities controlled by John Pearl and David Pearl. The total principal for these 24 notes was $1,065,325. Most of the deductions claimed for petitioner's cattle operation related to expenses paid with the proceeds of the alleged promissory notes with John Pearl and David Pearl.

**[\*8]** We note that the Pearl-controlled entities were not unrelated parties with respect to petitioner's cattle operation. Petitioner continually relied on the advice and services of David Pearl, and the cattle operation transacted almost exclusively with Pearl-controlled entities.

Petitioner testified that he was personally liable for the balance due on all 24 promissory notes. Despite petitioner's adamant testimony, the 24 promissory notes clearly state that they are secured only by his cattle, not by any personal liability of petitioner. All of the notes state that petitioner's obligation to pay the principal is consideration in exchange "FOR VALUE RECEIVED". Petitioner testified that he always paid interest on the promissory notes. Despite his vigorous assertion, a review of petitioner's records indicates that he never paid interest on any of the notes and that very few payments were made towards the principal of the notes. Petitioner's lack of adherence to the terms of the promissory notes, as discussed below, creates an inference that the promissory notes were something less than bona fide transactions.

On November 15, 2001, petitioner entered into promissory note 1-WVF-01 with Wea Valley Farms. The note had a principal of $17,250, an interest rate of 6%, and a due date of November 15, 2002. Petitioner claims that he transferred cattle to Wea Valley Farms and received credits on the principal of the note of

[*9] $3,624.81 on March 17, 2003, $4,500 on January 10, 2007, and $8,800 and $325.19 on December 20, 2008.  To support the transfer of the alleged $17,250 worth of cattle petitioner submitted into evidence a spreadsheet that lists the dates of the transfers and the amounts of the credits he received.  Petitioner has not submitted sufficient evidence that would allow us to find that he actually transferred the cattle to Wea Valley Farms.  Furthermore, even if petitioner made these alleged transfers, we note that the transfers occurred up to six years after the due date of the note.  Finally, the evidence provided by petitioner demonstrates that he paid no interest on this note, despite the fact that 6% interest was due for the period November 15, 2001 to 2002, and 21% interest per annum was due during any period of default.

On November 28, 2001, petitioner entered into promissory note 1-WL-01 with World Livestock.  The note had a principal of $20,400, an interest rate of 6%, and a due date of November 28, 2002.  Petitioner claims that he fully repaid the principal of the note.  To support the repayment of this note petitioner offered into evidence a spreadsheet that lists the amounts and dates of payments he alleges to have made.  Petitioner's spreadsheet indicates that he made a cash payment of $7,600 on November 30, 2001.  Petitioner offered no other evidence to support his alleged payment.  Assuming this payment was made, petitioner still owes $12,800

[*10] on this note. Furthermore, petitioner has not provided any evidence to demonstrate that any interest was paid on this note, despite the fact that 6% interest was due for the period November 28, 2001 to 2002, and 21% interest per annum was due during any period of default.

On November 28, 2001, petitioner entered into promissory note 1-GBNA-01 with Gene Bank. The note had a principal of $59,940, an interest rate of 6%, and a due date of November 28, 2002. On December 27, 2001, petitioner wrote a check to Gene Bank for $22,500. Petitioner did not pay the full amount of this note by the due date, and Gene Bank never notified petitioner that he was in default or that it would take legal action against him to collect the balance due of $37,440. Petitioner claims that the balance due of $37,440 was assumed by promissory note 3RG10, which petitioner entered into with Gene Bank on December 31, 2010. Promissory note 3RG10 had a principal balance of $37,440, an interest rate of 2%, and a due date of December 31, 2016. Promissory note 3RG10 does not reference promissory note 1-GBNA-01 or any other note. Furthermore, 1-GBNA-01 had a stated interest rate of 6% for the period November 28, 2001 to 2002, and a 21% interest rate per annum due during any period of default. To accept petitioner's testimony, we would also need to believe that when Gene Bank entered into promissory note 3RG10 it decided to forgo collecting the

[*11] interest on the outstanding balance of $37,440 that had accrued over a period of nine years.[6] Since note 3RG10 does not reference a prior note, we cannot accept petitioner's explanation that note 3RG10 was a renewal of the nine-year-old outstanding balance of note 1-GBNA-01. As a result, we find that note 1-GBNA-01 has not been fully paid and that no interest has been paid on this note.

On December 9, 2001, petitioner entered into promissory note 1-WL-01[7] with World Livestock. The note had a principal of $2,420, an interest rate of 6%, and a due date of December 9, 2002. Petitioner claims that he repaid the principal of the note with a $1,750 payment on December 10, 2003, and a $670 payment on February 6, 2010.[8] The only evidence that petitioner submitted to support these payments was spreadsheets that provided the dates and amounts of the alleged payments. Petitioner has not submitted sufficient evidence that would allow us to find that he actually made payments on this note. Furthermore, even if petitioner made these alleged payments, we note that the two payments were made

---

[6]Petitioner contradicted this assumption when he testified that interest continued to accrue on the balances due on the old notes, such as 1-GBNA-01, prior to the alleged refinancing.

[7]We note that this is the second promissory note that petitioner designated 1-WL-01.

[8]The payments total $2,420.

[*12] approximately one year and seven years after the due date of the note. Finally, assuming these payments were made, which we do not, petitioner has not provided any evidence to demonstrate that he paid any interest on this note, despite the note stating that 6% interest was due for the period December 9, 2001 to 2002, and 21% interest per annum was due during any period of default.[9]

On June 25, 2002, petitioner entered into promissory note RG-3-02 with Gene Bank. The note had a principal of $4,676, an interest rate of 6%, and a due date of October 15, 2003. By check dated October 14, 2003, petitioner paid $4,676 to Gene Bank. Petitioner did not pay any interest on this note despite the note having a per annum interest rate of 6%.

On June 25, 2002, petitioner entered into promissory note RG-1-02 with Reese Creek Farms, Inc. (Reese Creek Farms).[10] The note had a principal of $5,530, an interest rate of 6%, and a due date of October 15, 2003. By check dated October 14, 2003, petitioner paid $5,530 to Reese Creek Farms. Petitioner did not pay any interest on this note despite the note having a per annum interest rate of 6%.

---

[9]Petitioner's alleged dates of payment indicate that petitioner was in default on the note from December 9, 2002, to February 6, 2010.

[10]Reese Creek Farms, Inc. (Reese Creek Farms), is a C corporation incorporated in the State of Illinois. Reese Creek Farms is owned by John Pearl.

**[*13]**  On November 1, 2002, petitioner entered into promissory note RG-2-02 with Pearl Transport, Inc. (Pearl Transport).[11]  The note had a principal of $1,036, an interest rate of 6%, and a due date of November 1, 2005.  Petitioner alleges that he made a payment of $1,036 to Pearl Transport on February 21, 2010.  To support this payment petitioner offered into evidence a spreadsheet with the date and amount of the payment.  The evidence is not sufficient to allow us to find that he made this payment.  Furthermore, we note that this alleged payment occurred four years after the due date of the note.  Petitioner has not provided evidence that he paid any interest on this note, despite the note stating that 6% interest per annum was due for the period November 1, 2002 to 2005, and 21% interest per annum was due during any period of default.[12]

On November 15, 2002, petitioner entered into promissory note RG-4-02 with Wea Valley Farms.  The note had a principal of $4,200, an interest rate of 6%, and a due date of October 15, 2003.  By check dated October 14, 2003, petitioner paid $4,200 to Wea Valley Farms.  Petitioner did not pay any interest on this note despite the note having a per annum interest rate of 6%.

---

[11]Pearl Transport, Inc. (Pearl Transport), is a C corporation incorporated in the State of Indiana.  Pearl Transport is owned by David Pearl.

[12]The date that petitioner alleges he made the payment indicates that he had been in default from November 1, 2005, to February 21, 2010.

**[*14]**  On November 15, 2002, petitioner entered into promissory note RG-6-02 with Wea Valley Farms.  The note had a principal of $4,200, an interest rate of 6%, and a due date of November 16, 2006.  Petitioner claims that he fully paid the note through the transfer of "cattle" and "calf" on September 3, 2003, and December 20, 2008.  Petitioner offered into evidence a spreadsheet with the dates and amounts of the credits he received for the transfers.  Petitioner has not submitted evidence that would allow us to find that he made these transfers.  Furthermore, petitioner's spreadsheet indicates that he did not pay interest on this note, despite the note stating that 6% interest per annum was due for the period November 15, 2002, to November 16, 2006, and 21% interest per annum was due during any period of default.

On December 1, 2002, petitioner entered into promissory note RG-5-02 with World Livestock.  The note had a principal of $3,707, an interest rate of 6%, and a due date of October 15, 2003.  By check dated October 14, 2003, petitioner paid $3,707 to World Livestock.  Petitioner did not pay any interest on this note despite the note having a per annum interest rate of 6%.

On December 30, 2002, petitioner entered into promissory note RG-7-02 with World Livestock.  The note had a principal of $12,164, an interest rate of 6%, and a due date of December 30, 2007.  Petitioner claims that on March 1, 2006, he

**[*15]** received a credit of $86.54 for the lease of a bull to World Livestock; on April 1, 2008, he received a credit of $871.40 for the sale of a half interest in a bull; and on April 11, 2010, he made a payment of $3,500 to World Livestock. Petitioner offered into evidence three spreadsheets with the dates and amounts of the payment or credits he received. Petitioner has not submitted evidence that would allow us to find that he made the lease, sale, or payment. Petitioner further claims that the remaining amount of the debt he owed on note RG-7-02 ($7,706.06) was paid off by entering into promissory note 1RG10 with World Livestock on December 31, 2010. Promissory note 1RG10 had a principal of $56,524.38, an interest rate of 2%, and a due date of December 31, 2016. However, promissory note 1RG10 did not reference promissory note RG-7-02 or any other note. Since 1RG10 did not reference a prior note or how interest on any prior note would be treated, we cannot find that note 1RG10 was a renewal of note RG-7-02 or any other note. As a result, we find that note RG-7-02 has not been fully paid and that no interest was paid.

On December 1, 2003, petitioner entered into promissory note RG03-1 with World Livestock. The note had a principal of $14,005, an interest rate of 6%, and a due date of August 15, 2004. By check dated August 4, 2004, petitioner paid

[*16] $14,005 to World Livestock. Petitioner did not pay any interest on this note despite the note having a per annum interest rate of 6%.

On December 1, 2003, petitioner entered into promissory note RG03-2 with DuQuoin Processing, Inc (DuQuoin Processing).[13] The note had a principal of $28,295, an interest rate of 6%, and a due date of December 31, 2009. Petitioner claims that he fully paid this note. Petitioner claims that he made payments of $2,500, $2,500, and $7,500 on June 4, 2007, a payment of $6,000 on June 14, 2007, a payment of $6,500 on July 2, 2007, and a transfer of a bull for a credit of $3,295 on April 5, 2009. Petitioner did not provide any check copies or transfer agreements to support his alleged payments or transfer. Instead, petitioner offered into evidence a spreadsheet that listed the dates and amounts of payments. Petitioner has not provided sufficient evidence for us to find that he made these payments or transfer. Furthermore, assuming petitioner did make these payments, which totaled $28,295, then petitioner paid no interest on this note during the five years it took to fully pay this note. This is despite the fact that the note stated that 6% interest per annum was due for the period December 1, 2003, to December 31, 2009.

---

[13]DuQuoin Processing, Inc. (DuQuoin Processing), is a C corporation incorporated in the State of Illinois. DuQuoin Processing is owned by John Pearl and David Pearl.

[*17]  On January 20, 2004, petitioner entered into promissory note 1-RG-04 with Wea Valley Farms.  The note had a principal of $80,625, an interest rate of 9.25%, and a due date of March 10, 2005.  Petitioner alleges that he received a credit of $59,951.92 for cattle transferred on March 5, 2005, and a credit of $20,673.08 for cattle transferred on October 12, 2005, for total credits of $80,625.[14]  Respondent alleges that petitioner received a credit of $58,951.92 for cattle transferred on March 5, 2005.  This is $1,000 less than the credit petitioner alleges to have received.  To support their respective arguments the parties offered into evidence different spreadsheets that petitioners gave to respondent.  Regardless of whether petitioner received a credit of $59,951.92 or $58,951.92, we note that petitioner paid no interest on this note.  This is despite the fact that 9.25% interest per annum was due for the period January 20, 2004, to March 10, 2005, and 21% interest per annum was due during any period of default.  We note that the second alleged transfer occurred on October 12, 2005, more than six months after the due date of the note.  As a result, petitioner was in default on the note for over six months and was subject to the per annum interest rate of 21% for that period.

---

[14]In respondent's proposed findings of fact, respondent does not challenge petitioner's assertion that this note was paid by the transfer of cattle.

[*18] On February 20, 2004, petitioner entered into promissory note 2-RG-04 with Wea Valley Farms. The note had a principal of $250,791.35, an interest rate of 9.25%, and a due date of February 20, 2007. Petitioner alleges that he made 17 transfers of cattle to Wea Valley Farms from May 2, 2005, to September 18, 2009. Petitioner alleges he was credited with $91,893.87 towards the repayment of this note for these transfers. To support the alleged transfers of cattle petitioner offered into evidence spreadsheets with the dates and amounts of the credits he received. Petitioner has not submitted evidence that would allow us to find that he made these transfers. Petitioner further claims that the remaining amount of the debt he owed on note 2-RG-04 ($158,897.48) was paid off by entering into promissory note 2RG10 with Wea Valley Farms on December 31, 2010. Promissory notes 2RG10 had a principal of $173,641.08, an interest rate of 2%, and a due date of December 31, 2016. Promissory note 2RG10 did not reference promissory note 2-RG-04 or any other note. Since note 2RG10 did not reference a prior note or how interest on any prior note would be treated, we cannot find that note 2RG10 was a renewal note of 2-RG-04 or any other note. As a result, we find that note 2-RG-04 has not been fully paid and that no interest has been paid on this note.

**[*19]** On April 1, 2004, petitioner entered into promissory note 6-RG-04 with Gene Bank. The note had a principal of $2,700, an interest rate of 6%, and a due date of December 31, 2009. Petitioner claims that he fully paid the note through the transfer of cattle on January 14, 2010. To support this claim petitioner offered into evidence a spreadsheet with the date and the credit he received for the transfer. Petitioner has not submitted evidence that would allow us to find that he made this transfer. Furthermore, petitioner's spreadsheet indicates that he did not pay any interest on this note, despite the note stating that 6% interest per annum was due for the period April 1, 2004, to December 31, 2009, and 21% interest per annum was due during any period of default.

On July 2, 2004, petitioner entered into promissory note 7-RG-04 with World Livestock. The note had a principal of $51,878.60, an interest rate of 6%, and a due date of December 31, 2009. Petitioner alleges that he made three transfers of cattle to World Livestock from August 1, 2006, to April 1, 2008, and was credited with $35,378.60 towards the principal of this note. Petitioner also alleges that he made a $16,500 payment to World Livestock on April 30, 2010. To support these assertions petitioner offered into evidence spreadsheets with the dates and amount of the transfers and payment. Petitioner has not submitted evidence that would allow us to find that he made these transfers or payment.

[*20] Furthermore, the spreadsheets indicate that petitioner has not paid any interest on this note, despite the note stating that 6% interest per annum was due for the period July 2, 2004, to December 31, 2009, and 21% interest per annum was due during any period of default.

On October 10, 2004, petitioner entered into promissory note 4-RG-04 with Reese Creek Farms. The note had a principal of $13,600, an interest rate of 6%, and a due date of December 31, 2009. Petitioner claims that he transferred three cattle to Reese Creek Farms on February 1, 2006, and received a credit of $13,600. Assuming this to be true,[15] we note that petitioner did not pay any interest on the note, despite the note stating that 6% interest per annum was due.

On December 30, 2004, petitioner entered into promissory note 5-RG-04 with DuQuoin Processing. The note had a principal of $130,350, an interest rate of 6%, and a due date of October 31, 2005. Petitioner testified that he transferred to DuQuoin Processing equipment worth $130,350 as a payment on this note on October 12, 2005. Petitioner offered into evidence a spreadsheet which listed the date and amount of the credit petitioner received for transferring the equipment to DuQuoin Processing. Petitioner has not submitted any credible documentation or third-party witnesses to support his allegation for us to find that he transferred

[15]Respondent does not allege that this transfer of cattle did not occur.

[*21] $130,350 of equipment to DuQuoin Processing.  Furthermore, petitioner's spreadsheet indicates that he has not paid any interest on this note, despite the note stating that 6% interest per annum was due.

On December 31, 2004, petitioner entered into promissory note 3-RG-04 with Wea Valley Farms.  The note had a principal of $41,133.60, an interest rate of 9.25%, and a due date of December 31, 2009.  Petitioner claimed that he made payments of $18,950 on January 1, 2010, and $657.31 on October 4, 2010.  To support the alleged payments petitioner offered into evidence a spreadsheet with the dates and amounts of the payments.  Petitioner has not submitted evidence that would allow us to find that he made these payments.  Petitioner further claims that the remaining amount of the debt he owed on note 2-RG-04, $21,526.29, was paid off by entering into promissory note 2RG10 with Wea Valley Farms on December 31, 2010.  However, promissory note 2RG10 did not reference promissory note 3-RG-04, or any other note.  Since note 2RG10 did not reference a prior note or how interest on any prior note would be treated, we cannot find that note 2RG10 was a renewal of note 3-RG-04 or any other note.  As a result, we find that note 2-RG-04 has not been fully paid and that no interest has been paid on this note.

On December 31, 2004, petitioner entered into promissory note 8-RG-04 with World Livestock.  The note had a principal of $48,818.32, an interest rate of

[*22] 6%, and a due date of December 31, 2010.  Petitioner claims that the debt he owed on note 8-RG-04 was fully paid by entering into promissory note 1RG10 with World Livestock on December 31, 2010.  However, promissory note 1RG10 did not reference promissory note 8-RG-04 or any other note.  Since note 1RG10 did not reference a prior note or how interest on any prior note would be treated, we cannot find that note 1RG10 was a renewal of note 8-RG-04 or any other note.  As a result, we find that note 8-RG-04 has not been fully paid and that no interest has been paid on the outstanding amount.

To prove that he made payments on the promissory notes petitioner provided annual spreadsheets titled promissory note summary for the years 2001, 2002, 2003, and 2004.  The summaries were prepared by David Pearl.  Petitioner testified that the summaries were made each year and were given to petitioner soon after the end of the year.  Petitioner testified that he kept the summaries in his ordinary course of business and that he reviewed the summaries "many, many times."

Petitioner testified that he received the 2001 promissory note summary at the end of 2001 or the beginning of 2002.  During cross-examination of petitioner, respondent noted that the 2001 summary listed two payment dates in March and December 2003.  Despite respondent pointing this out, petitioner insisted that he

[*23] received the summary in 2002. Petitioner also testified that the 2002 promissory note summary was created at the end of 2002 or the beginning of 2003. Under cross-examination, respondent noted to petitioner that the summary listed multiple payments on October 15, 2003. When asked whether the 2002 promissory note summary could have been created at the beginning of 2003, but list a payment date of October 15, 2003, petitioner acknowledged: "Chronologically, it doesn't make sense." Petitioner also asserted that the 2003 and 2004 summaries were created at the beginning of 2004 and 2005, respectively. Under cross-examination respondent noted that the 2003 and 2004 promissory note summaries listed payment dates in 2007. Petitioner admitted that his assertion "[w]ouldn't make sense, wouldn't make sense." Respondent then questioned petitioner regarding promissory note 1-GBNA-01 with Gene Bank, which was listed on the 2001 summary. The note was executed on November 28, 2001. There followed this colloquy:

[RESPONDENT]: The due date is November 28th, 2002?

[PETITIONER]: Yep.

[RESPONDENT]: It says the amount paid is $22,500.

[PETITIONER]: Yes.

[RESPONDENT]: It says the date paid is January 4th of 2001.

[*24] [PETITIONER]:  Yes.

[RESPONDENT]:  Mr. Gardner, you made a payment on a note before you ever even had the note?

[PETITIONER]:  According to this I did.

       *     *     *     *     *     *     *

[RESPONDENT]:  You did not pay this note by November 28th, 2002, did you?

[PETITIONER]:  I don't recall.  It looks like I paid it before it was even due.

       *     *     *     *     *     *     *

[RESPONDENT]:  Mr. Gardner, you didn't pay this by November 28th, 2002?

[PETITIONER]:  No, I did not.

We find that the promissory note summaries were not credible.  We also find that petitioner's testimony in regard to the payment of the promissory notes was not credible.  Petitioner did not pay interest on any of the notes to World Livestock, Wea Valley Farms, Gene Bank, Reese Creek Farms, Pearl Transport, and DuQuoin Processing.  Additionally, petitioner was delinquent in paying most of the notes and never fully paid most of the notes.  Petitioner has never been notified by the lenders that he was in default on a promissory note, and the lenders

[*25] have never taken legal action against petitioner with respect to the promissory notes.

Transactions in 2002 and Beyond

On July 1, 2002, petitioner entered into Cattle Lease Agreement - 001 with Gene Bank wherein he agreed to lease 42 cows to Gene Bank for a period of seven years.[16] Gene Bank was to provide care to the cattle and implant them.

On July 28, 2003, petitioner entered into Cattle Lease Agreement - 006 with DuQuoin Processing wherein he agreed to lease nine cows and a half interest in a bull to DuQuoin Processing for a period of seven years. The ownership of the growth in the herd would be split between DuQuoin Processing and petitioner.

Pursuant to a one-page bill of sale dated January 10, 2004, Wea Valley Farms transferred ownership of 15 cows to petitioner in exchange for $100,000. The purported bill of sale was signed by David Pearl but not by petitioner.

On January 13, 2004, petitioner entered into Cattle Lease Agreement - 009 with Wea Valley Farms in which Wea Valley Farms agreed to lease to petitioner

---

[16]Respondent asserts petitioner could not have had 42 cows ready for breeding in July 2002. Petitioner points to Cattle Lease Agreement - 001 and notes that the 42 leased cows were to be implanted on December 31, 2002. Cattle Lease Agreement - 005 indicates that petitioner would have a base herd of 36 cattle on December 31, 2002. An unsigned letter from DuQuoin processing indicates that petitioner had 36 cattle as of August 17, 2002.

**[*26]** 265 cattle for one year in exchange for $93,449.95. The agreement provided that contemporaneous with the execution of the agreement, petitioner would deliver a promissory note payable to Wea Valley Farms in the amount of $93,499.95. Respondent asserts that petitioner did not deliver this promissory note. Petitioner asserts that the $93,499.95 was included in the $250,791.35 of principal of promissory note 2-RG-04. Promissory note 2-RG-04 is dated February 20, 2004, and would not have been contemporaneous with the execution of Cattle Lease Agreement - 009 on January 13, 2004. Furthermore, promissory note 2-RG-04 did not reference Cattle Lease Agreement - 009, nor did it require petitioner to make any payments before February 20, 2007. As a result, petitioner has failed to prove that he delivered the promissory note of $93,499.95 or that this amount was included in the principal of promissory note 2-RG-04. Cattle Lease Agreement - 009 also required petitioner to pay the sum of $31,000 in cash to Wea Valley Farms on or about December 1, 2005. Petitioner claims that this requirement was satisfied by the payment he made on promissory note 2-RG-04. However, even if we were to assume that the $93,499.95 was included in the principal of note 2-RG-04, which we do not, petitioner still did not make $31,000

**[*27]** of cash payments on note 2-RG-04 by December 1, 2005, or for years after such date.[17] In addition to failing to deliver the promissory note and make the $31,000 payment, we also note that petitioner failed to adhere to many of the other requirements of the agreement.[18]

On March 20, 2005, petitioner entered into Cattle Lease Agreement - 005 with Wea Valley Farms in which petitioner leased 35 cows from Wea Valley Farms. The agreement provided that petitioner would carry a normal farm operation public liability and property damage policy of insurance on the herd throughout the term of the lease. Petitioner never carried such an insurance policy. The agreement also required petitioner to join an applicable breed

---

[17]Petitioner's records indicate that in 2005 he made only $9,453.78 of payments on this note. This was substantially less than the $31,000 petitioner was required to pay. Petitioner offered into evidence a spreadsheet to support his claim that he made payments on this note. We note that this spreadsheet is insufficient evidence for us to find that petitioner made these payments.

[18]The agreement provided that petitioner would carry a normal farm operation public liability and property damage policy of insurance on the herd throughout the term of the lease. Petitioner never carried such an insurance policy. The agreement also required that petitioner would not pledge the herd as collateral to secure any debt to another entity or person without prior written consent. The promissory notes petitioner entered into with World Livestock, Gene Bank, Reese Creek, Pearl Transport, and DuQuoin Processing pledged the herd as collateral. Petitioner did not receive the prior written consent of Wea Valley Farms. The agreement required petitioner to register the calves with a breed association. Petitioner failed to register the calves with a breed association.

[*28] association and register the calves retained in the herd. Petitioner did not fulfill these responsibilities. The agreement also required that petitioner would not pledge the herd as collateral to secure any debt to another entity or person without prior written consent. The promissory notes petitioner entered into with World Livestock, Gene Bank, Reese Creek, Pearl Transport, and DuQuoin Processing pledged the herd as collateral. Petitioner did not receive the prior written consent of Wea Valley Farms. The agreement also required petitioner to register the calves with a breed association. Petitioner never registered the calves with a breed association.

Pursuant to a bill of sale dated March 15, 2007, petitioner sold cattle identified as numbers 1985, 9210, and 2316 to World Livestock and received a credit of $11,200 on promissory note 1-WL-01. However, in a letter dated February 29, 2012, to respondent's counsel, petitioner's counsel specifically stated that the cattle numbered 1985 and 2316 died on March 15, 2007. Petitioner claims that he never sold a dead cow and that the identification of cattle numbers 1985 and 2316 was a typographical error. To support this allegation petitioner cites the expert witness report of Ronald D. Long, which states that petitioner either misspoke or received bad information. The expert witness report cites no documentation to substantiate petitioner's allegation that cattle numbers 1985 and

**[*29]** 2316 did not die on March 15, 2007, nor has petitioner provided any documentation.

Equipment Purchase

Petitioner claimed that on January 20, 2005, he purchased harvesting equipment from D-B Leasing Co., Inc. (D-B Leasing). Respondent offered into evidence a bill of sale between D-B Leasing and a soon-to-be-formed Illinois corporation. The bill of sale provided that D-B Leasing would sell certain equipment[19] for $165,000 in cash and delivery of a promissory note for $244,000. The bill of sale was signed by petitioner and "Tom Dawson". Thomas M. Dawson was an officer of D-B Leasing in 2004. By letter dated December 19, 2012, petitioner's counsel informed respondent that petitioner met with Mr. Dawson in February 2004 and again in October 2004 to view the equipment. Petitioner testified that he told petitioner's counsel he met with Mr. Dawson on two occasions when he flew to Louisville, Kentucky. Under cross-examination petitioner admitted that he had not met with Mr. Dawson on two occasions. When petitioner was asked whether he had ever met Mr. Dawson he replied: "As I said,

---

[19]The bill of sale stated that the equipment sold was described in exhibit A to the bill of sale. Exhibit A was not offered into evidence.

[*30] in passing I think I did on one trip, one of those two trips, you know. I flew in and out. I couldn't swear to it."

At trial Mr. Dawson testified that he sold the equipment to David Pearl. Mr. Dawson testified that he had never spoken to or met petitioner. Mr. Dawson stated that he had never seen the bill of sale and that the purported "Tom Dawson" signature was not his signature.[20] Respondent also offered into evidence a promissory note for $244,000 that was signed by petitioner and "Tom Dawson". Mr. Dawson stated that he had never seen this promissory note and that the signature on the note was not his.

Petitioner offered into evidence a check dated January 20, 2005, for $149,000 from petitioner to Dawson-Baker.[21] Mr. Dawson testified that while he did not recall ever receiving this specific check, he did recall receiving a check in the amount of $149,000.

Petitioner's Goals For His Cattle Operation

Petitioner's records indicate that the original goal of his alleged cattle operation was to develop genetically superior cattle. At the onset of his cattle

---

[20]Mr. Dawson testified that he never saw the agreement before respondent showed it to him a month before trial.

[21]D-B Leasing was formerly known as Dawson-Baker Packing Co., Inc.

[*31] operation petitioner created a one-page business plan for 2001. The 2001 business plan stated that petitioner's short-term goal was to "provide an atmosphere for rapid genetic improvement" and to "[p]osition the genetic pool and herd growth in a situation that will allow it to produce long-term profits". The long-term goal was to "[p]roduce animals that are genetically superior for reproductive efficiency, optimum carcass size, progeny, parasite resistant, optimum carcass composition". A letter from petitioner's counsel to Revenue Agent Jerry Arthur, dated May 19, 2008, stated: "In 2001, Mr. Gardner started his operation with the goal of realizing a profit through the sale of genetically superior cattle." The description of petitioner's original goal in this letter is consistent with petitioner's 2001 business plan.

The business plan for 2002 stated: "The sound genetic base now will make bull marketing in the future much more creditable [sic]." In a letter dated December 2, 2003, David Pearl indicated that petitioner's goal is to advance the genetic value of his herd. The 2004 business plan stated that "there could be some genetic up dating [sic] of my first herd" and that petitioner was "looking into bull leasing to others for more fed cattle numbers with genetic documented ancestry for packing plant access." One of the goals of the 2006 business plan was "to have at least one daughter from a superior mating".

[*32]   Cattle that are registered with breed associations and with documented genetics generally sell for a higher price than cattle that are not genetically documented.  Ron Daily, an expert witness for respondent, stated in his report: "The purchase or sale of unregistered cattle with no known production information cannot be compared to the purchase or sale of cattle registered with a breed association with genetic information published for the buyers to influence their decision to purchase."  Petitioner's documented goal of developing genetically superior cattle was understandable.

Despite his documented goal regarding the genetic quality of his cattle, petitioner has failed to provide any documentation of the genetic quality of his cattle or provide evidence sufficient for us to find that he maintained such records.[22]  An expert witness report for respondent by Mr. Daily stated:  "In order to genetically engineer a herd, it is necessary to track genetics through the use of records.  Mr. Gardner has failed to maintain any records relating to the genetic makeup of the herd I viewed."  The report also noted:  "There is no reference to the genetic makeup or superiority of the bulls used to produce the cattle I viewed."

---

[22]In fact petitioner maintained very little information on the cattle. Petitioner did not retain records of the birth dates or pregnancy of his cattle.

[*33] During cross-examination petitioner's expert witness, Dr. Long, admitted that he did not view any records relating to the genetics of petitioner's cattle.[23]

In addition to petitioner's lack of records documenting the genetics of his cattle, the entities controlled by David Pearl and John Pearl also failed to maintain such records. World Livestock and DuQuoin Processing ceased maintaining genetic information on their cows and bulls prior to January 2004. Wea Valley Farms ceased maintaining calving records and records on its donor cows prior to January 2004. Gene Bank ceased maintaining records of embryos sold to third parties (including petitioner) prior to January 2004.

To explain why petitioner does not have records to document the genetic material of his herd, he alleges that his goal at the outset of his cattle operation was to own a packing plant in order to have a vertically integrated cattle operation. Therefore, petitioner contends, it was never necessary to maintain information on

---

[23]Dr. Long's expert report stated: "This herd and this Breeding Program has been engineered such that it lends itself as a potential source of genetic material for sale to other breeders and also as a source of superior meat animals for human consumption." During cross-examination, respondent read the above sentence from the report and there followed this colloquy:

[RESPONDENT]: "But there are no genetic records for this cattle, correct?"

[MR. LONG]: "Not that I saw, no."

[*34] the genetic superiority of his cattle.  However, a review of petitioner's

records contradicts this assertion.  The 2001, 2002, and 2006 business plans made

no mention of owning a packing plant.  Instead, those business plans indicated that

petitioner's primary goal was to breed a genetically superior herd of cattle.

Petitioner's 2004 business plan mentioned a packing plant in one sentence:

"DuQuoin Processing plan[s] to open a beef processing facility, a plan needs to be

developed for a large increase in the cow herd size and a potential participation on

my behalf in the packing plant."  The 2004 business plan did not state that

petitioner's goal was to own a packing plant or even obtain an ownership interest

in it.  Instead, in a mere sentence, the 2004 business plan discussed his "potential

participation" in the packing plant.[24]

The parties have stipulated that DuQuoin Speciality Meats, LLC (DuQuoin

Speciality Meats), is a limited liability company that was organized in the State of

Illinois on June 24, 2009.[25]  David Pearl and petitioner each own a 50% interest in

DuQuoin Speciality Meats.  The Form 1065 filed for 2010 states:  "This is a

---

[24]The 2004 business plan also discussed updating the genetic quality of petitioner's herd.

[25]Form 1065, U.S. Return of Partnership Income, for DuQuoin Speciality Meats for the taxable year 2010 states that the business was started on January 1, 2010.

[*35] startup business with 2010 activity limited to installation of equipment to be used in the business operation. Active business started in 2011." The formation and commencement of active business operations of DuQuoin Speciality Meats occurred 10 years after petitioner started his cattle operation and 6 years after it was mentioned in petitioner's business plan dated January 3, 2004. On the basis of petitioner's records, as well as the great length of time that elapsed before petitioner acquired his interest in DuQuoin Speciality Meats, we find that petitioner's assertion that his original goal was to own a packing plant is not supported by the evidence. Instead, we find that petitioner's stated original goal, as documented by his numerous business plans as well as by David Pearl and petitioner's counsel, was to develop the genetic superiority of his cattle and raise animals capable of producing a profit from seed stock production and commercial beef markets.

Expert Witness Reports

Petitioner's expert witness was Dr. Long. Dr. Long's report concluded that petitioner's herd is genetically engineered to create superior cattle for genetic material and meat animals. Dr. Long rated each cow with a number for body condition, frame, and udder and gave a qualitative description for each cow, such as "Good Angus Cow" or "Acceptable Angus Cow". Dr. Long's report failed to

**[*36]** provide a fair market value appraisal of each cow and calf allegedly owned by petitioner.

Respondent's expert witness was Mr. Daily. Mr. Daily noted: "In order to genetically engineer a herd, it is necessary to track genetics through the use of records. Mr. Gardner has failed to maintain any records relating to the genetic makeup of the herd I viewed." Mr. Daily noted that the cattle he viewed "are not registered and have no known production data." Mr. Daily concluded that with "no production data available, breeding animals leaving the herd and then re-entering the herd, embryo transplant calves traded for mature cows and no data for sires used in recent years, the cattle viewed are simply average commercial cows." Therefore, Mr. Daily concluded that the petitioner's cattle can be valued only as common commercial cattle. Mr. Daily's expert report provided a fair market value appraisal of each cow and calf allegedly owned by petitioner. Mr. Daily concluded that petitioner's 187.5 cattle and calves had a total fair market value of $193,325. We find that Mr. Daily's valuation of petitioner's cattle is credible.

Petitioner's Books Were Not Maintained Professionally

Rayford Marett has been a certified public accountant for 23 years and has prepared petitioners' joint Federal income tax returns since the taxable year 2000.

**[\*37]**  The consultation retainer agreements required World Livestock to provide annual evaluation reports to petitioner.  These reports were called farm income and expense summaries and were prepared by David Pearl.  The summaries provided the total amounts of annual expenses by category, such as trucking $6,800.  The summaries did not provide a detailed listing of the individual expenses included in each category.  In short, the summaries were mere summaries and were no more than two pages.  David Pearl did not seek assistance from anyone else in preparing the summaries.  David Pearl had no background in accounting or taxation.  During his deposition David Pearl acknowledged "I'm not an accountant."

The summaries prepared by David Pearl were the only documentation Mr. Marett received to report petitioner's cattle operation on Schedule F, Profit or Loss From Farming.  Mr. Marett never spoke with Mr. Pearl regarding the preparation or contents of the summaries.  In fact, Mr. Marett was not aware of who prepared the summaries.  Mr. Marett did not receive any other documentation relating to the cattle activity.

Pamela Britt was the bookkeeper and secretary at R.E. Gardner & Associates.  Ms. Britt testified that she paid bills for the cattle operation and that she kept track of the checks issued by petitioner.  Ms. Britt testified that she did

[*38] not keep records of the bills and checks in QuickBooks for his cattle operation. Ms. Britt did keep track of the bills and checks for petitioner's life insurance business in QuickBooks. Mr. Marett testified that petitioner provided him with QuickBooks reports for Arrow Properties, LLC, a real estate business in which petitioner was the managing member.

Lack of Records

Petitioner testified that in conducting his cattle operation he was on the phone between 92 and 97 hours in 2001, 100 hours in 2002, and between 90 and 100 hours in 2003, 2004, 2005, and 2006. Ms. Britt claimed she reviewed petitioner's phone records in order to document the number of hours he spent on the phone relating to his cattle activity. Petitioner did not offer into evidence any of his phone records to support his assertion.

Petitioner testified that he made approximately five to six trips each year to visit his cattle. Petitioner did not provide any flight receipts or any other documentary evidence to prove that he visited his cattle operation in 2002. Petitioner provided three receipts for flights he took to St. Louis, Missouri, to visit his cattle in 2003 and 2004.

Petitioner claimed to have made additional trips on behalf of his cattle operation. Petitioner provided seven flight receipts for trips he alleged were

[*39] related to his cattle activity.  Petitioner traveled quite frequently for his insurance business.  Petitioner testified that five of the seven trips were also made for the purpose of conducting his insurance business.

We are doubtful as to how much time, if any, petitioner spent conducting the business of his cattle operation on these trips.  Petitioner visited Houston, Texas, from September 27 to 30, 2002, to attend an insurance conference. Petitioner claimed that this trip also related to his cattle operation because he would "discuss cows" during the insurance conference.  Before trial petitioner's counsel informed respondent that petitioner visited his cattle in Illinois from June 24 to 27, 2003.  However, at trial petitioner testified that he flew from Raleigh, North Carolina to Nashville, Tennessee, on June 24, 2003, returning June 27, 2003.  Petitioner testified that the primary purpose of this trip was to attend the national sheriffs conference.  However, petitioner insisted that the trip also related to his cattle activity because he "had some meetings with some other cattle people".  Petitioner provided no documentation to support his allegation that he met with anyone on this trip to discuss the cattle industry.  Furthermore, petitioner's testimony concerning the alleged meetings was both brief and vague, with no specific details of the meetings.  Petitioner's self-serving testimony does

 **[*40]** not allow us to find that he conducted the business of his cattle operation on these trips, which were primarily made to attend insurance or sheriff conferences.

Losses and Income From Cattle Operation

Petitioner reported the income and expenses of his cattle operation on Schedules F. For the taxable years 2002, 2005, 2006, and 2009, petitioner reported gain from the sale of livestock on Forms 4797, Sales of Business Property, or Schedules D, Capital Gains and Losses. Petitioner reported the following sales, expenses, and net income or loss from his cattle operation for the taxable years 2001 through 2010:

| Year | Sales | Expenses | Net Income (Loss) |
|------|-------|----------|-------------------|
| 2001 | - 0 - | $100,010 | ($100,010) |
| 2002 | $10,276 | 46,373 | (36,097) |
| 2003 | 14,220 | 44,095 | (29,875) |
| 2004 | - 0 - | 614,747 | (614,747) |
| 2005 | 116,168 | 41,850 | 74,318 |
| 2006 | 79,207 | 19,563 | 59,644 |
| 2007 | 23,414 | 18,211 | 5,203 |
| 2008 | 13,900 | 17,978 | (4,078) |
| 2009 | 46,813 | 8,984 | 37,829 |
| 2010 | 66,167 | 80,031 | (13,864) |
| Total | 370,165 | 991,842 | (621,677) |

The amounts listed in the sales column include the sales reported on Schedules F as well as Schedules D and Forms 4797. Petitioner reported total net losses of $798,671 for the taxable years 2001, 2002, 2003, 2004, 2008, and 2010, and total

**[\*41]** net income of $176,994 for the taxable years 2005, 2006, 2007, and 2009.

As a result, petitioner's cattle operation had an overall loss of $621,677 for the

taxable years 2001 through 2010.

The Internal Revenue Service (IRS) began an examination of petitioner's

cattle operation during 2005. On May 11, 2009, respondent issued to petitioners a

notice of deficiency for the years at issue. Respondent disallowed the losses from

the cattle operation reported on Schedules F for the taxable years 2002, 2003, and

2004.[26] Respondent determined deficiencies of $10,448, $9,655, and $236,600 in

petitioners' Federal income tax for the taxable years 2002, 2003, and 2004,

respectively, and accuracy-related penalties of $2,089.60, $1,931, and $47,320

under section 6662(a) for the taxable years 2002, 2003, and 2004, respectively.[27]

---

[26]Respondent also removed the $2,920 of gain from the sale of cattle reported on Form 4797 of petitioners' 2002 tax return.

[27]Form 5278, Statement--Income Tax Changes, attached to the notice of deficiency stated that petitioners had overpayments of $16,360 and $16,065 for the taxable years 2005 and 2006. "The jurisdiction of the Tax Court is generally limited to redetermining the correct amount of a deficiency. Sec. 6214(a)." Murphree v. Commissioner, 87 T.C. 1309, 1311 (1986). "The Tax Court in redetermining a deficiency of income tax for any taxable year * * * shall have no jurisdiction to determine whether or not the tax for any other year or calendar quarter has been overpaid or underpaid." Sec. 6214(b). Our jurisdiction is limited to the years for which respondent determined deficiencies. Accordingly, we do not have jurisdiction to determine whether there were overpayments for the 2005 and 2006 taxable years.

[*42] Petitioners timely filed a petition disputing the determinations in the notice of deficiency.

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

I. Section 183

We must decide whether petitioner's cattle operation was an activity "not engaged in for profit" within the meaning of section 183. Section 183(a) generally provides that no deduction attributable to an activity which is not engaged in for profit is allowed except as provided in section 183(b). Section 183(b)(1) allows those deductions which are otherwise allowable regardless of profit objective. Section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).

**[*43]** Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowed under section 162 for expenses of carrying on activities that constitute a trade or business. Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

It is well established that in order to take a deduction for expenses incurred in carrying on a trade or business "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), aff'g 91 T.C. 686 (1988).

"The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case." Sec. 1.183-2(a), Income Tax Regs.; see also Siegel v. Commissioner, 78 T.C. 659, 699 (1982). Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of objective factors to be considered in

[*44] deciding whether an activity is engaged in for profit. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. No single factor is determinative. See id. Petitioners have the burden of proving that they had the requisite profit objective. See Taras v. Commissioner, T.C. Memo. 1997-553, 1997 Tax Ct. Memo LEXIS 638, at *13, aff'd without published opinion, 187 F.3d 627 (3d Cir. 1999).

A. Manner in Which the Taxpayer Carries On the Activity

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs.

**[*45]**     1. <u>Businesslike Manner</u>

Most of the deductions for expenses associated with petitioner's cattle operation appear to have been financed by promissory notes that petitioner signed. Petitioner entered into 24 promissory notes with a total principal of $1,065,325. Each of the notes had a stated interest rate. Petitioner did not pay interest on any of the 24 notes. Furthermore, petitioner has only established $54,618 of payments towards the principal of the notes. Petitioner claimed to have made more cash payments and to have received credits towards the principal of the notes in exchange for transfers of cattle to the lenders. To support this assertion petitioner offered into evidence annual promissory note summaries. We find that the summaries were not contemporaneous and were not reliable. The summaries did show that petitioner did not pay most of the notes prior to their due date. Petitioner was in default on most of the notes.[28]

Petitioner pledged his cattle as collateral in each of the promissory notes. Petitioner's manner of paying the notes is not indicative of a taxpayer who is concerned about protecting the primary assets of his business. Since petitioner

---

[28]The 24 promissory notes provided that the interest rate would increase by 21% if petitioner was in default. Despite defaulting on the notes, which increased the interest rate by 21%, petitioner never paid interest on any of the notes. The lenders never took legal action against petitioner.

[*46] defaulted on most of the notes, the lenders could have seized his cattle. Had they done so, petitioner's cattle operation would have ground to a halt. Petitioner's failure to pay interest as well as most of the principal of the promissory notes indicates that he did not conduct the cattle operation in a businesslike manner.[29]

Petitioner's violations of the cattle lease agreements, as well as his inaction when the lenders violated the agreements, also demonstrate that petitioner did not conduct the cattle operation in a businesslike manner. Cattle Lease Agreement - 009 required petitioner to deliver a promissory note and cash payment to Wea Valley Farms. Petitioner failed to do either. Cattle Lease Agreement - 005 with Gene Bank and Cattle Lease Agreements - 009 and 005 with Wea Valley Farms (agreements) required petitioner to carry a normal farm operation public liability and property damage policy of insurance on the herd throughout the term of the agreements. Petitioner never carried such a policy. The agreements provided that petitioner could not pledge the cattle as collateral to secure any debt. Petitioner pledged the cattle as collateral in 24 promissory notes. The agreements also required petitioner to register the calves with applicable breed associations.

---

[29]The lenders' failure to take legal action against petitioner when he failed to pay interest and defaulted on most of the promissory notes is evidence that the promissory notes were something less than bona fide business transactions.

[*47] Petitioner never registered the cattle with a breed association. Petitioner's failure to adhere to the terms of the agreements indicates that he was not conducting the cattle operation in a businesslike manner.[30]

Petitioner's original goal in the alleged cattle operation, as stated in his business plans, was to develop and sell genetically superior cattle. In an expert witness report for respondent, Mr. Daily noted that cattle with documented genetics that are registered with breed associations generally sell for a higher price than cattle that are not genetically documented. The report stated:

> In order to genetically engineer a herd, it is necessary to track genetics through the use of records. Mr. Gardner has failed to maintain any records relating to the genetic makeup of the herd I viewed. * * * The cattle I viewed are not registered and have no production data. Therefore, they can only be valued as common commercial cows. The purchase or sale of unregistered cattle with no known production information cannot be compared to the purchase or sale of cattle registered with a breed association with genetic information published for buyers to influence their decision to purchase.

Petitioner's expert witness, Dr. Long, acknowledged under cross-examination that he did not view any genetic records for petitioner's cattle. World Livestock, DuQuoin Processing, Wea Valley Farms, and Gene Bank ceased maintaining

---

[30]Gene Bank's and Wea Valley Farms' failure to inform petitioner that he was violating the agreements or take legal action against petitioner is evidence that these agreements were something less than bona fide business transactions.

**[\*48]** genetic information prior to January 2004. Petitioner's failure to maintain genetic records or register his cattle with breed associations reduced the price at which he could have sold the cattle. Petitioner's failure to maintain genetic records is more conspicuous in the light of the fact that his stated original goal was to develop and sell genetically superior cattle. Petitioner's failure to maintain genetic records for his cattle or register them with breed associations indicates that he was not conducting the cattle operation in a businesslike manner.[31]

### 2. Financial Information

"The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner." Burger v. Commissioner, T.C. Memo. 1985-523, 1985 Tax Ct. Memo LEXIS 107, at \*20, aff'd, 809 F.2d 355 (7th Cir. 1987). A taxpayer who has profits as his primary objective will keep detailed records of the expenses of his operation in order to determine the operation's profitability. The few records that petitioner offered into evidence indicated that petitioner's recordkeeping was haphazard and

---

[31]It is even more indicative in the light of the fact that the cattle lease agreements required petitioner to register the calves with applicable breed associations.

[*49] demonstrated a laissez faire attitude toward monitoring the expenses of his operation.

Ms. Britt, petitioner's secretary, testified that she recorded bills and checks for petitioner's life insurance business in QuickBooks. Mr. Marett testified that he received QuickBooks reports from petitioner in order to prepare the tax return for Arrow Properties, LLC, a real estate business in which petitioner was the managing member. Although petitioner kept track of his other businesses in QuickBooks, he did not record any of the bills and checks from his cattle operation in QuickBooks.

Petitioner received from David Pearl income and expense summaries on an annual basis. This was the only financial information that petitioner received regarding the results of his cattle operation. Petitioner reported net losses from his cattle operation of $100,010 for 2001, $36,097 for 2002, $29,875 for 2003, and $614,747 for 2004. Petitioner allegedly was losing a substantial amount of money, yet he did not receive financial information on a basis that was more current than once a year. Receiving financial information on an annual basis, in the light of the fact that petitioner incurred substantial losses, indicates that petitioner did not conduct the cattle operation in a businesslike manner. See Burger v. Commissioner, 809 F.2d at 359. We also note the financial information

**[*50]** petitioner received was prepared by David Pearl, who controlled most of the entities petitioner's cattle operation transacted with. David Pearl has no background in accounting or taxation. A person conducting an operation in a businesslike manner, who had the financial means like petitioner, would be expected to hire a person experienced in accounting to prepare the financial reports of the operation. Petitioner's lack of concern that his financial information was prepared by a person he did substantial business with, and not an independent adviser, is indicative of petitioner's failure to conduct the cattle operation in a businesslike manner.

### 3. Business Records

Petitioner claimed to have conducted the business of his cattle operation on the phone for over 90 hours each year from 2001 through 2006. Ms. Britt claimed to have reviewed telephone records. Nevertheless, petitioner failed to offer these records into evidence. Similarly, petitioner claimed to have made five to six trips each year to visit his cattle operation. However, petitioner offered into evidence only three receipts for flights he took to St. Louis, Missouri, which was the location of his alleged cattle operation.

**[*51]**    4. Business Plans

On brief petitioners argue: "The courts have found that having a business plan leads to the determination that the taxpayer conducted the activity in a business-like manner." Petitioners cite Dennis v. Commissioner, T.C. Memo. 2010-216, 2010 Tax Ct. Memo LEXIS 248, for support. However, Dennis states: "Having a business plan may suggest that a taxpayer conducted the activity in a businesslike manner." Id., 2010 Tax Ct. Memo LEXIS 248, at *19-*20 (emphasis added). Petitioner's numerous business plans do not establish that he conducted his cattle operation in a businesslike manner. In fact, we note that petitioner did not adhere to his original goal of developing genetically superior cattle as stated in his business plans. Petitioner failed to maintain genetic records or register his cattle with breed associations. Mr. Daily noted that, as a result of these failures, petitioner's cattle are not considered genetically superior and are valued as mere common commercial cattle. To explain away this failure, petitioner testified that his original goal was to own a packing plant. However, his business plans for 2001, 2002, and 2003 never discussed owning a packing plant. Instead, petitioner's business plans referenced the genetic development of his cattle. Petitioner's 2004 business plan, dated January 3, 2004, is the first mention of a packing plant and it refers to "a potential participation".

**[\*52]**    5. <u>Conclusion</u>

Petitioner did not pay the interest and principal he owed on the promissory notes, and he failed to fulfill his responsibilities under the cattle lease agreements. Petitioner did not receive financial information in a timely manner and outsourced the preparation of the information to David Pearl, who readily admitted he was not an accountant. Petitioner did not provide records to support the substantial amount of time he allegedly spent conducting the cattle operation on the phone or receipts for the numerous flights he claimed to have made to visit his cattle. Accordingly, we find that this factor favors respondent.

B. <u>Expertise of the Taxpayer or His Advisers</u>

Preparation for an activity by extensive study of its accepted business and economic practices or consultation with those who are expert therein may indicate that a taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs.

Petitioner testified that he had been researching the cattle industry since the 1980s. Petitioner failed to offer any documentary evidence of his decades-long research effort. Similarly, petitioner has failed to demonstrate that he was knowledgeable of the cattle industry. Petitioner claimed that he consulted with

[*53] many experts in the industry. Aside from David Pearl, petitioner failed to offer into evidence the experience of the individuals with whom he allegedly consulted.

David Pearl testified that he received a bachelor's degree in animal science from Purdue University. David Pearl has operated his family farm for decades and had worked with Purdue University. Petitioner claims to have relied on the advice of David Pearl. However, David Pearl was not an independent adviser to petitioner. Instead, petitioner's cattle operation transacted almost exclusively with entities controlled by David Pearl. As a result, petitioner's reliance on advice from a person with whom he exclusively transacted is not indicative of a profit motive.

We find that this factor favors respondent.

C. <u>The Time and Effort Expended by the Taxpayer in Carrying On the Activity</u>

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an objective to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs.

**[*54]**   Petitioner claimed to have made all of the management decisions relating to his cattle operation.  Petitioner claimed that he decided which cows to purchase, which embryos to implant, which bulls to stud, which cows to cull, which cows to trade in to or out of the herd, and which cows were to be donor cows.  Petitioner also claimed that he negotiated the prices paid for cows, embryos, semen, feed, and supplies, the sale prices for cows he sold from his herd, and the interest rates on the promissory notes.  Petitioner claimed to have spent over 90 hours on the phone each year conducting his cattle operation and that he visited the cattle five to six times a year.

In addition to the cattle operation, petitioner pursued other profitable business ventures for the years at issue.  Petitioner operated an insurance business which reported income of $152,373, $163,305, and $579,236, for the taxable years 2002, 2003, and 2004, respectively.  Petitioner was also a director for Corporate Endowment Solutions, an insurance agency.  Petitioner also had ownership interests and was involved in the operations of four other entities during the years at issue.  Petitioner was a member of Woodbridge, LLC, and Colwen Lodging, LLC.  Petitioner was a 33% owner in WINC, LLC, and was the president of State Insurance Services, Inc.  Petitioner reported total losses of $30,116 and $37,020

[*55] for the taxable years 2002 and 2003 and total income of $80,318 for the taxable year 2004 on Schedules E for these four entities.

The amount of time that petitioner alleges he spent on the cattle operation has not been substantiated with documentation that petitioner and his secretary claim they had.  Petitioner's other business activities during the years at issue were substantial and are convincing evidence that petitioner did not spend much of his personal time and effort in carrying on the cattle operation.

"The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity."  Sec. 1.183-2(b)(3), Income Tax Regs.  Petitioner claims that he hired caretakers to provide daily care for the cattle.  Petitioner did not provide any evidence as to the competency of the caretakers he hired.  While petitioner claims to have outsourced the daily chores of the cattle operation, he also claims to have made all of the management decisions.  However, petitioner could not substantiate the time that he allegedly spent on the cattle operation.

We find that this factor favors respondent.

**[\*56]** D.  <u>Expectation That Assets Used in Activity May Appreciate in Value</u>

A taxpayer may intend, despite a loss from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized.  Sec. 1.183-2(b)(4), Income Tax Regs.; <u>see also</u> <u>Pederson v. Commissioner</u>, T.C. Memo. 2013-54, 2013 Tax Ct. Memo LEXIS 55, at \*44.  "There is an overall profit if net earnings and appreciation are sufficient to recoup losses sustained in prior years."  <u>Filios v. Commissioner</u>, T.C. Memo. 1999-92, 1999 Tax Ct. Memo LEXIS 111, at \*19-\*20, <u>aff'd</u>, 224 F.3d 16 (1st Cir. 2000).

Mr. Daily concluded in his expert report that the fair market value of petitioner's cattle was $193,325.  Petitioner entered into 24 promissory notes with a total principal of $1,065,325.  For the taxable years 2001 through 2010, petitioner reported $798,671 of net losses for the taxable years 2001, 2002, 2003, 2004, 2008, and 2010, and $176,994 of net income for the taxable years 2005, 2006, 2007, and 2009.  As a result, petitioner's cattle operation had an overall loss of $621,677 for the taxable years 2001 through 2010.  The amount of petitioner's overall loss is more than three times the amount of the fair market value of his cattle.  Furthermore, petitioner owes a substantial amount of debt on the promissory notes.

**[*57]** As a result, we find that petitioner did not have a justifiable expectation that the assets used in the cattle operation would appreciate.[32] Accordingly, we find that this factor favors respondent.

E. Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer has engaged in similar or dissimilar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioner's unrelated business activities involve real estate and insurance. Petitioner has been successful in these activities. However, petitioner has introduced little evidence as to the manner in which he conducted these businesses.

Accordingly, we find this factor is neutral.

F. Taxpayer's History of Income or Losses With Respect to the Activity

Where losses continue to be sustained beyond the period which customarily is necessary to bring an operation to profitable status, such continued losses, if not

---

[32]We note that petitioner failed to introduce credible evidence to establish that he was provided with or conducted research upon which he could justifiably have had an expectation that the assets involved in the cattle operation would appreciate.

[*58] explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.

In regard to his cattle operation petitioner reported: a net loss of $100,010 for 2001; a net loss of $36,097 for 2002; a net loss of $29,875 for 2003; a net loss of $614,747 for 2004; net income of $74,318 for 2005; net income of $59,644 for 2006; net income of $5,203 for 2007; a net loss of $4,078 for 2008; net income of $37,829 for 2009; and a net loss of $13,864 for 2010. Petitioner reported total net losses of $798,671 for the taxable years 2001, 2002, 2003, 2004, 2008, and 2010, and total net income of $176,994 for the taxable years 2005, 2006, 2007, and 2009. As a result, petitioner's cattle operation had an overall loss of $621,677 for the taxable years 2001 through 2010.

"A series of losses during the initial or start-up state of an activity may not necessarily be an indication that the activity is not engaged in for profit." Sec. 1.183-2(b)(6), Income Tax Regs. "Start-up losses are especially common in breeding operations." Fields v. Commissioner, T.C. Memo. 1981-550, 1981 Tax Ct. Memo LEXIS 190, at *17. Petitioner incurred net losses during the first four years of his cattle operation. Generally, this would not be indicative of a lack of

**[\*59]** profit motive.  See id., 1981 Tax Ct. Memo LEXIS 190, at \*16 (taxpayer had losses for the first five years of his cattle operation).

We note that petitioner's net losses ballooned from $36,097 and $29,875 in 2002 and 2003, respectively, to $614,747 in 2004.  At the same time, petitioner's income from his insurance business also ballooned from $152,373 and $163,305 in 2002 and 2003, respectively, to $579,236 in 2004.  We also note that in regard to the four entities in which petitioner had ownership interests, he reported total losses of $30,116 and $37,020 for the taxable years 2002 and 2003 and total income of $80,318 for the taxable year 2004.  Due to the manner in which petitioner conducted his cattle operation, we take a critical view of the coinciding of the substantial increase in petitioner's net loss from his cattle operation in the same year that the income from his insurance business and other ownership interests also substantially increased.

We note that petitioner reported $780,729 of net losses for the taxable years 2001 through 2004.  The 2005 tax year was the first year that petitioner reported a net income from his cattle operation.[33]  Coincidentally, the IRS began an examination of petitioner's cattle operation during 2005.  The initial appearance of

---

[33]Petitioners reported $74,318 of net income from his cattle operation on their timely filed 2005 Federal income tax return.

**[\*60]** a profit in the taxable year in which the IRS commenced an examination is conspicuous.

We find that this factor is neutral.

G. <u>The Amount of Occasional Profits, If Any, Which Are Earned</u>

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. "An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." <u>Id.</u>

As discussed <u>supra</u>, petitioner had an overall loss of $621,677 for the taxable years 2001 through 2010. The overall loss of $621,677 vastly exceeds the fair market value of petitioner's cattle, $193,325.

Accordingly, we find that this factor favors respondent.

H. <u>Financial Status of the Taxpayer</u>

"The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity (particularly if the losses from the activity generate

[*61] substantial tax benefits) may indicate that the activity is not engaged in for profit. Id. "The legislative history of section 183(a) and (b) indicates a particular concern about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income." Taras v. Commissioner, 1997 Tax Ct. Memo LEXIS 638, at *24 (citing S. Rept. No. 91-552, at 95-100 (1969), 1969-3 C.B. 423, 484-487).

The losses from the cattle operation provided petitioners with significant tax benefits. In regard to his cattle operation petitioner reported a net loss of $36,097 for 2002, $29,875 for 2003, and $614,747 for 2004. Petitioner reported net income from his insurance business of $152,373 for 2002; $163,305 for 2003; and $579,236 for 2004. The losses from the cattle operation were used to offset petitioner's substantial income from his insurance business and other commercial ventures.[34]

Accordingly, we find that this factor favors respondent.

I. Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational

---

[34]We are not convinced that petitioner actually incurred all of the expenses that he reported for the cattle operation.

[*62] or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. Raising cattle generally lacks significant recreational aspects. See Burrus v. Commissioner, T.C. Memo. 2003-285, 2003 Tax Ct. Memo LEXIS 287, at *39. We do not believe that petitioner was motivated by the recreational elements of cattle operations. We find that this factor favors petitioners.

J.  Section 183 For-Profit Requirement Conclusion

Considering the factors discussed above, we find that petitioners have not established that the cattle operation was an activity "engaged in for profit" within the meaning of section 183 for the years at issue. As a result, the losses generated by the cattle operation are not deductible under section 162 or 212 for any of the years at issue.

II.  Accuracy-Related Penalty

Respondent determined that petitioners were liable for section 6662(a) accuracy-related penalties of $2,089.60, $1,931, and $47,320 for the taxable years 2002, 2003, and 2004. Section 6662(a) imposes an accuracy-related penalty equal to 20% of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, a substantial understatement of income tax. Sec. 6662(b)(2).

**[\*63]**   Section 7491(c) provides that the Commissioner bears the "burden of production" with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his "burden of production", however, the "burden of proof" remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of reasonable cause under section 6664.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Respondent contends that the underpayment of tax for each year at issue is attributable to a substantial understatement of income tax.  There is a substantial understatement of income tax for any taxable year if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000.  Sec. 6662(d)(1)(A).  The understatement of income tax for each year at issue exceeds the greater of 10% of the tax required to be shown on petitioners' return or $5,000.  Therefore, petitioners' understatements are substantial.  Consequently, we conclude that respondent has met his burden of production with respect to petitioners' substantial understatements of income tax.

**[\*64]**  A.  <u>Reasonable Cause</u>

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion.  See <u>Higbee v. Commissioner</u>, 116 T.C. at 448.  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Petitioners have the burden of proving that the penalty is inappropriate because of reasonable cause under section 6664.  See Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item."  <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement.  <u>Id.</u> (citing <u>United States v. Boyle</u>, 469 U.S. 241 (1985)); sec. 1.6664-4(b), Income Tax Regs.  Whether a taxpayer relies on the advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and

[*65] circumstances.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98;

sec. 1.6664-4(c)(1), Income Tax Regs.  For reliance to be reasonable, "the

taxpayer must prove by a preponderance of the evidence that the taxpayer meets

each requirement of the following three-prong test:  (1) The adviser was a

competent professional who had sufficient expertise to justify reliance, (2) the

taxpayer provided necessary and accurate information to the adviser, and (3) the

taxpayer actually relied in good faith on the adviser's judgment."  Neonatology

Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Petitioners argue that their tax returns for the years at issue were prepared

by Mr. Marett and that he was a competent professional.  Mr. Marett has been a

certified public accountant for 23 years.

Mr. Marett used the income and expense summaries to prepare petitioners'

tax returns.  The summaries were prepared solely by David Pearl.  Mr. Marett

testified that the summaries were the only documentation he received relating to

the cattle operation.[35]  Mr. Marett never spoke with Mr. Pearl regarding the

---

[35]We note that the information reported on the summaries was not the same
as the information reported on petitioners' tax returns.  The 2002 summary
reported $10,060 of expenses.  Petitioners' Schedule F reported $46,373 of
expenses.  The 2002 summary reported interest expense of $2,980.  Petitioners'
Schedule F reported interest expense of $4,069.  Petitioner has not offered
evidence to substantiate the additional interest expense.

[*66] preparation or contents of the summaries. In fact, Mr. Marett was not aware of who prepared the summaries.

While Mr. Marett was a competent professional, the information he input on the tax returns was compiled by David Pearl.[36] Petitioner relied on David Pearl to prepare the income and expenses summaries. Petitioner knew the information from these summaries would be reported on the tax returns. It was clear from the deposition of David Pearl that he did not have a competent understanding of tax law or preparing tax returns. In his deposition David Pearl acknowledged "I'm not an accountant." We find that David Pearl was not a competent professional and had no expertise in accounting or taxation. Petitioner was not justified in relying on David Pearl to prepare income and expense summaries that Mr. Marett would input on the tax returns. Accordingly, we find that petitioners failed to satisfy the first prong of the reasonable reliance test.

Furthermore, we find that petitioners failed to provide necessary and accurate information to Mr. Marett. The income and expense summaries state that petitioner had interest expense of $2,980 and $26,897 for the taxable years 2002 and 2004, respectively. We have found that petitioner never paid interest on the

---

[36]Mr. Marett testified that he never counseled petitioner on the deductibility of the expenses of the cattle operation.

[*67] promissory notes.[37] Petitioner has not demonstrated that he paid any interest for the 2002 and 2004 taxable years. Furnishing Mr. Marett with information that indicates petitioner paid substantial interest for the 2002 and 2004 taxable years, when in fact he paid no interest, demonstrates that petitioners did not provide accurate information to Mr. Marett.

Petitioners have failed to demonstrate that David Pearl was a competent professional on whom they could justifiably rely to prepare the financial information of the cattle operation that was reported on their tax return. Furthermore, petitioners have failed to demonstrate that they provided necessary and accurate information to Mr. Marett. Accordingly, petitioners have not proven reasonable cause by good-faith reliance on the advice of a professional.

B. Substantial Authority

The amount of an understatement is reduced by that portion of the understatement which is attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment. Sec. 6662(d)(2)(B)(i). "In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities

---

[37]Petitioners did not provide Mr. Marett with copies of the promissory notes for the purpose of preparing the tax returns.

**[\*68]** in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions." Antonides v. Commissioner, 91 T.C. at 702; see also sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is objective, and therefore it is not relevant in determining whether the taxpayer believed substantial authority existed. Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

Petitioners claim that sections 162 and 183 provide substantial authority for the claimed deductions. However, the facts of petitioner's particular case, discussed at length, indicate that there was no substantial authority for the losses and other deductions claimed.

C. Adequate Disclosure

Petitioners argue that they adequately disclosed the relevant facts of the income and expenses associated with the cattle operation and that they had a reasonable basis for the tax treatment of the income and expenses. Therefore, they contend that they should not be liable for the accuracy-related penalty under section 6662(d)(2)(B)(ii).

We note that petitioners did not have a reasonable basis for the expenses they reported from the cattle operation.

**[*69]**   Respondent argues that under section 1.6662-4(f)(2), Income Tax Regs., for the disclosure to be adequate, petitioners were required to make the disclosure on Form 8275, Disclosure Statement, or Form 8275-R, Regulation Disclosure Statement.  Petitioners did not attach Forms 8275 or Forms 8275-R to their returns for the years at issue.

Accordingly, we hold that petitioners are liable for the accuracy-related penalties under section 6662(a) for their underpayments of tax for the years at issue.

III.  Conclusion

The cattle operation was an activity "not engaged in for profit" within the meaning of section 183 for the years at issue.  As a result, the losses from the cattle operation are not deductible under section 162 or 212 for any of the years at issue.  We have also held that petitioners are liable for the section 6662(a) accuracy-related penalty for each of the years at issue.

In reaching our decision, we have considered all arguments made by the parties.  To the extent not mentioned or addressed, they are irrelevant or without merit.

[*70]  To reflect the foregoing,

Decision will be entered

under Rule 155.
